Alfonso R. SISNEROS, Plaintiff,

v.

Crispus C. NIX and Paul Hedgepeth, Defendants.

No. C 4–91–CV–30574.

United States District Court,
S.D. Iowa,
Central Division.

Mar. 6, 1995.

Barbara A. Schwartz, Clinical Law Professor at the Iowa College of Law, Iowa City, IA, and two student interns in the University of Iowa College of Law, Legal Services Clinic, Linda Kobliska and Michael Glackin, for plaintiff Sisneros.

Kristin W. Ensign, Asst. Atty. Gen., Des Moines, IA, and by a law student intern, Patrick Waldron, for defendants.

## AMENDED AND SUBSTITUTED MEMORANDUM OPINION AND ORDER ON LIABILITY AND QUALIFIED IMMUNITY AND ORDER ON REMEDIES

I. INTRODUCTION AND PROCEDURAL BACKGROUND .................. 1319

II. STANDARDS FOR SUMMARY JUDGMENT ........................... 1320

III. FINDINGS OF FACT ............................................. 1321
 A. Parties ................................................... 1321
 1. Plaintiff ............................................. 1321
 2. Defendants ......................................... 1322
 B. English–Only Regulation ............................... 1322
 C. Sisneros' Transfer Back to Arizona ................... 1323

IV. CONSTITUTIONALITY OF THE ENGLISH–ONLY POLICY ............. 1324
 A. Standard Of Review .................................... 1324
 1. Introduction: Balancing prisoners' rights and security .............. 1324
 2. The reasonable relationship test ..................... 1325
 B. Application of the Reasonable Relationship Test ....... 1328
 1. Facial Constitutional Challenge ....................... 1328
 2. "As Applied" Constitutional Challenge ................ 1331

V. CONSTITUTIONALITY OF SISNEROS' TRANSFER ..................... 1333
 A. Introduction ............................................ 1333
 B. Appropriate Standard for Analyzing Sisneros' Claim of Retaliatory
 Transfer ............................................... 1334
 C. Was Sisneros' Transfer Retaliatory? ................... 1334

VI. QUALIFIED IMMUNITY ............................................. 1335
 A. Standards For Qualified Immunity ....................... 1335
 1. Scope and purpose of qualified immunity ............. 1336
 2. The court's inquiry ................................. 1337
 3. The inquiry on a motion for summary judgment .................. 1338
 B. Qualified Immunity In This Case ....................... 1338
 1. Retaliatory Transfer ................................. 1339
 2. The English–Only Rule .............................. 1339

VII. RELIEF .........................................................1341
 A. Additional Findings Of Fact.....................................1342
 1. Sisneros' transfer and status in Arizona ..........................1342
 2. Transfers under the Interstate Corrections Compact................1343
 B. Damages ....................................................1344
 C. Injunctive Relief .............................................1347
 1. Appropriateness of injunctive relief...............................1348
 2. Shaping injunctive relief in this case ..............................1349
 3. The permanent injunction .......................................1352

VIII. CONCLUSION ..................................................1352

BENNETT, District Judge.

Given the crescendo of public uproar over frivolous prisoner litigation clogging the federal courts, this case is an important reminder that however fortissimo the public clamor, the court must always listen for a solo voice with a legitimate complaint of a constitutional violation. This is such a case. Plaintiff Alfonso R. Sisneros is a former inmate at the Iowa State Penitentiary ("ISP"), at Fort Madison, Iowa, who is currently incarcerated in Arizona. Sisneros was transferred from Arizona to Iowa in January of 1991 pursuant to the Interstate Corrections Compact ("ICC"), Iowa Code § 913 (1993). Sisneros claims that while at ISP, his First and Fourteenth Amendment rights were violated by Defendants Crispus C. Nix, ISP's former warden, and Paul Hedgepeth, Deputy Warden of Programs, when Sisneros was prohibited from sending or receiving mail written in a language other than English (the "English-only" rule). Sisneros speaks English, Spanish, and Apache, but has relatives living in Arizona and Texas who cannot communicate in English. Sisneros also asserts that he was impermissibly transferred from ISP back to the Arizona correctional system in February 1992 in retaliation for exercising his constitutional right to pursue inmate grievances and file suit against ISP officials.

On April 7, 1994, this court entered a Memorandum Opinion And Order On Liability And Qualified Immunity, an amended version of which follows. Following the filing of that order, the court held a hearing on the issue of proper relief or remedies on July 8, 1994. Thus, in addition to amending the prior opinion on liability and qualified immu-

nity, the present order determines what remedies shall be afforded Sisneros for the violation of his constitutional rights as the result of his retaliatory transfer back to Arizona. This part of the order requires the court to grapple with the question of its power to impose remedial actions upon a guilty defendant who nonetheless is no longer in control of the wronged person. Thus, the court must consider the extent to which its orders for remedial action can and should be honored by nonparties to the present action, but who, quite literally, hold the keys to vindication of the inmate's rights.

## I. INTRODUCTION AND PROCEDURAL BACKGROUND

Sisneros filed this 42 U.S.C. § 1983 action on September 12, 1991. Sisneros has been represented throughout this action by the University of Iowa College of Law Legal Clinic. On June 25, 1993, the parties filed a consent pursuant to 28 U.S.C. § 636(c) to proceed before me while I was a United States magistrate judge.[1]

Sisneros and the Defendant prison officials have both moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. Sisneros seeks a declaratory judgment, declaring the prison's English-only policy violates the First and Fourteenth Amendments of the U.S. Constitution. Sisneros requests that the court order injunctive relief prohibiting the defendants from continuing to violate his constitutional rights and requiring the defendants to modify the English-only policy.

Regarding his transfer back to the Arizona Department of Corrections, Sisneros seeks a

---

**1.** On August 30, 1994, I was appointed United States District Court Judge for the Northern District of Iowa. All federal district judges and magistrate judges in Iowa are cross-designated to preside over matters in both the Northern and Southern Districts.

declaratory judgment that this action violated his First Amendment right to petition the courts. He also requests injunctive relief ordering the defendants to expedite his return to ISP and restraining the defendants from further violations of his First Amendment right to petition the court. Sisneros seeks actual damages, exemplary damages, and reasonable attorney fees on both claims. Defendants argue that Sisneros has failed to state a claim upon which relief can be granted, that none of the defendants' acts violated Sisneros' constitutional rights, and that the defendants are entitled to qualified immunity. Finally, the defendants argue that even if they violated Sisneros' rights by transferring him back to Arizona in retaliation for his engaging of protected activities, they did not cause any of the damages of which he complains.

Before addressing the merits of Sisneros' assertions that the English-only policy is unconstitutional and that he was impermissibly transferred to Arizona in retaliation for exercising his First Amendment rights, the court will address the appropriate standard for summary judgment under Rule 56.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Eighth Circuit Court of Appeals recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed

'to secure the just, speedy and inexpensive determination of every action.'" *Wabun–Inini*, 900 F.2d at 1238 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)); *Hartnagel v. Norman*, 953 F.2d 394, 396 (8th Cir. 1992).

The standard for granting summary judgment is well established. *Rule 56 of the Federal Rules of Civil Procedure* states in pertinent part:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

*Fed.R.Civ.P.* 56(b) & (c) (emphasis added); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Munz v. Michael*, 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S. Great Lakes Fleet, Inc.*, 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone*, 993 F.2d 1328, 1331 (8th Cir.1993); *Woodsmith Publishing Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir.1990); *Wabun–Inini*, 900 F.2d at 1238 (citing *Fed.R.Civ.P.* 56(c)).[2] A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, and give that party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993,

---

**2.** An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)). "Only disputes over facts

that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Hartnagel*, 953 F.2d at 394.

994, 8 L.Ed.2d 176 (1962)); *Munz v. Michael,* 28 F.3d 795, 796 (8th Cir.1994); *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir.1994); *Johnson v. Group Health Plan, Inc.,* 994 F.2d 543, 545 (8th Cir.1993); *Burk v. Beene,* 948 F.2d 489, 492 (8th Cir.1991); *Coday v. City of Springfield,* 939 F.2d 666, 667 (8th Cir.1991), *cert. denied,* 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for [its] motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552); *see also Reed v. Woodruff County, Ark.,* 7 F.3d 808, 810 (8th Cir.1993). The moving party is not required by *Rule* 56 to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

"When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. The party opposing a motion for summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Although "direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" *Metge v. Baehler,* 762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro Products, Inc. v. Herrick,* 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied sub nom. Metge v. Bankers Trust Co.,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir.1994).

In *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510, *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2552–53, and *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56, the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). The trial court, therefore, must "assess the adequacy of the nonmovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." *Hartnagel,* 953 F.2d at 396 (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552). If the nonmoving party fails to make a sufficient showing of an essential element of a claim with respect to which it has the burden of proof, then the moving party is "entitled to judgment as a matter of law." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552; *Woodsmith,* 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Burk,* 948 F.2d at 492; *Woodsmith,* 904 F.2d at 1247. With these standards in mind, the court turns to consideration of the parties' motions for summary judgment.

### III. FINDINGS OF FACT

#### A. Parties

##### 1. Plaintiff

The record reveals that the following facts are not in dispute. Alfonso Sisneros is a United States citizen, currently serving a 1981 State of Arizona sentence of 25 years to life for assault with a deadly weapon. Sisneros speaks English, as well as Spanish and Apache. Sisneros has indicated in his affidavit in support of his motion for summary judgment that "I am of Apache and Mexican dissent." Sisneros further indicated that

"[m]y first and preferred language is Spanish." Sisneros also indicated in his affidavit that "[w]hile incarcerated in Arizona, I regularly corresponded with family and friends in Spanish and Apache in conformance with the rules and regulations of the prison."

Pursuant to the Interstate Corrections Compact ("ICC"), Iowa Code § 913 (1993), Sisneros was transferred from Arizona to the Iowa Medical and Classification Center ("IMCC") in January of 1991. He was then transferred to ISP in February of 1991. At ISP orientation, Sisneros was informed of I.A.C. section 291–20.4(1) (1991), the English-only rule, and its application concerning correspondence to and from his non-English speaking relatives.

On February 22, 1991, Sisneros wrote a memorandum to defendant Hedgepeth, informing Hedgepeth of his non-English speaking relatives and requesting an exception to the English-only policy for the purpose of corresponding with these relatives. In the memorandum, Sisneros stated that some of his relatives speak either Spanish or Apache, but not English. Sisneros' family lives in the southwestern United States, primarily in Texas and Arizona. In particular, Sisneros expressed a desire to write to his grandmother, who speaks Apache. However, the memorandum also stated that Sisneros had relatives who do speak English.[3] Later, in response to an interrogatory, Sisneros stated that he wished to write only in Spanish, and that only the names of family members and friends would have been written in Apache.

On February 25, 1991, Hedgepeth replied to Sisneros' memorandum. Hedgepeth informed Sisneros that he should have his English-speaking relatives help the other relatives write and interpret letters.[4]

On March 11, 1991, Sisneros filed a grievance with the Iowa Department of Corrections regarding the English-only rule. In response, Sisneros received a memorandum reiterating the prison's policy prohibiting the sending or receiving of letters in foreign languages. Sisneros then filed two lawsuits against ISP. One of the lawsuits was the present one, filed on or about September 12, 1991. The second was a motion for contempt in *Walker v. Scurr*, Civil Nos. 83–313–D and 84–26–B, on or about November 8, 1991.[5] Only the former litigation is directly under consideration here.

### 2. Defendants

While Sisneros was incarcerated at ISP, defendant Crispus Nix was the Warden and defendant Paul Hedgepeth was the Deputy Warden. Defendant Paul Grossheim was the Director of the Iowa Department of Corrections, but is now deceased. Defendants are being sued both individually, and in their official capacities. Defendants Nix and Hedgepeth acted under the color of state law concerning their actions towards Sisneros.

### B. English–Only Regulation

Iowa Administrative Code section 291.20.4(1) (1991) regarding prisoner correspondence provides, "[l]etters will not be delivered which are written in a foreign lan-

**3.** The February 22, 1991, memorandum to Hedgepeth states:

> I was told that I need to contact you concerning correspondence, Part (B) written in foreign language or code. My problem is this, I have relitives [sic] who write me in Apache and spanish. And some who during the coure [sic] of a letters [sic] tend to use spanish words or Apache. My grandmother who does not speak english speake [sic] Apache and she tends to call me by my Native Indian name, and usually sends her letters along with my uncle; or one of my cousins. IN this day and age some do write in english, and others in spanish or Apache! I am told that this could be a problem and could result in rejection of my correspondence. I have no controle [sic] over the writing in there [sic] own language. Because they are all three my language!

**4.** Hedgepeth's February 25, 1991, response states:

> Please refer to Iowa Admin Code 291—Chapter 20.4(1) (Available in the library) Letter [sic] are not permitted in foreign languages unless that is the *only* language of the *inmate*. Try to have the family members who write English prepare the letters for the others. A few words won't make a lot of difference but tell them not to abuse that much.

**5.** From the record presented in the summary judgment proceeding, it appears that the *Walker v. Scurr* litigation involves, *inter alia,* questions concerning how the ISP staff determined whether inmates are Native Americans and entitled to participate in Native American religious practices at ISP.

guage or code, unless the foreign language is the only language of the inmate. Exceptions may be made by the warden/superintendent or designee." ISP has adopted and enforced this code provision in identical form in State of Iowa, Department of Corrections Policy IN–V–64(18), and accordingly prohibits the sending or receiving of letters in languages other than English. This policy also applies to the use of telephones, although there is no restriction prohibiting inmates from speaking in a foreign language to each other. The defendants had no input into the Iowa Administrative Code, but did have input in the adoption of the provision in the prison policy. Incorporating the code into prison policy is standard procedure.

The court finds that the primary purpose for the English-only policy is to further legitimate institutional security reasons and to retain the ability to monitor inmate correspondence. The purpose of this policy is to prevent inmates from continuing illegal and clandestine activities while incarcerated. Admittedly, prison officials have never discovered any plans for escape or illegal activity written in a foreign language, but the rule does not allow such correspondence in prison at all, and prisoners are notified of this policy upon entering ISP. Although all non-privileged mail [6] is opened and scanned, only five to ten percent is actually read. There is no written standard giving a percentage of mail which should be monitored more closely.

ISP has no interpreter on staff and to hire one would be costly. ISP does employ Hispanics. An informal survey in the past indicated that none of the ISP's employees was able to speak or write Spanish fluently, but there is no current, accurate record of the capabilities of the ISP's present employees. The inmate minority population at ISP consists of approximately twenty-five percent African–Americans, a small percentage of Native American Indians, and one or two Asians. Approximately one percent of the prison population at ISP is Hispanic.

Although the policy does allow exceptions to be made by the warden or the deputy warden, the only exceptions in the past have been made when an inmate did not speak English. Defendant Hedgepeth indicated that in order for an exception to be granted, there would have to be "no other way for the communication to exist."

### C. Sisneros' Transfer Back to Arizona

Sisneros alleges that his transfer in February of 1992 from ISP back to Arizona was made in retaliation for his litigation activity and use of the ISP prison grievance procedure. Not surprisingly, the defendants deny this allegation.

On December 26, 1991, Charles Lee, the Deputy Director of the Iowa Department of Corrections, who is not a party to this action, wrote an Arizona official requesting that Arizona find an alternative placement for Sisneros. The stated reason for the request was that Sisneros "doesn't seem to like the restrictions placed on him in Iowa and has not been a very cooperative guest." This letter set the transfer wheels in motion and on February 5, 1992, Sisneros was transferred from ISP back to the Arizona correctional system. Sisneros did not request this transfer nor did he desire to return to Arizona. Hedgepeth was the ISP official who initiated and was primarily responsible for Sisneros' transfer from ISP back to Arizona.

Sisneros did not have a disciplinary record while at ISP and did not pose a disciplinary problem for the ISP staff. The only reason stated by Nix and Hedgepeth for transferring Sisneros was that he was "unhappy" with some of the restrictions at ISP and that he was an "obnoxious" and "ungracious" guest. Interestingly, Hedgepeth never met Sisneros, and Nix met him only once—and that was early in 1991 in connection with an inmate grievance filed by Sisneros concerning the English-only rule.

Hedgepeth indicated that the only matters Sisneros "complained" of were the English-only rule and a dispute that he was having with a prison official concerning whether Sisneros had sufficient Native American blood to be included within the terms of a consent decree in the *Walker* litigation. Hedgepeth acknowledges that both of these "complaints" resulted in Sisneros filing griev-

---

**6.** Legal mail is considered privileged and is not opened.

ances and the two lawsuits Sisneros filed against ISP officials. Additionally, Hedgepeth believed Sisneros was "ungracious" only because he "complained." Finally, Hedgepeth believed Sisneros was "obnoxious" only because he utilized the ISP grievance procedure.

Warden Nix indicated Sisneros was returned to Arizona because he was "unhappy" at ISP. Nix further indicated that the two things Sisneros complained of, problems with practicing his Native American religion and the English-only rule, resulted in litigation and that Nix was aware of the litigation prior to Hedgepeth initiating the transfer of Sisneros back to Arizona. The defendants failed to articulate, let alone establish, a nonretaliatory reason for transferring Sisneros back to Arizona in February of 1992.

## IV. CONSTITUTIONALITY OF THE ENGLISH–ONLY POLICY

### A. Standard Of Review

#### 1. Introduction: Balancing prisoners' rights and security

The balance between the rights of the inmates and the maintenance of security must be at the forefront of any review of prison regulation. "[O]n one hand, prisoners do not lose all their constitutional rights while behind bars; on the other hand, federal courts must defer to the judgment of those officials responsible for the inordinately difficult task of operating a prison." *Quinn v. Nix*, 983 F.2d 115, 118 (8th Cir.1993) (citing *Turner v. Safley*, 482 U.S. 78, 84–85, 107 S.Ct. 2254, 2259–2260, 96 L.Ed.2d 64 (1987); *Procunier v. Martinez*, 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224 (1974), *overruled in part by Thornburgh v.*

*Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). Prisoners' constitutional rights are "significantly limited or substantially constrained in order to further legitimate objectives of the penal system," especially in the interest of security. *Nichols v. Nix*, 810 F.Supp. 1448, 1455 (S.D.Iowa 1993), *aff'd*, 16 F.3d 1228 (8th Cir.1994) (Table). However, the prisoners retain those rights which are "not inconsistent with imprisonment itself or incompatible with the objects of incarceration." *Id.* "Foremost among these objectives is internal security." *Timm v. Gunter*, 917 F.2d 1093, 1099 (8th Cir.1990) (citing *Hudson v. Palmer*, 468 U.S. 517, 524, 104 S.Ct. 3194, 3199, 82 L.Ed.2d 393 (1984))), *cert. denied*, 501 U.S. 1209, 111 S.Ct. 2807, 115 L.Ed.2d 979 (1991).

Thus, when addressing an inmate's claim of alleged constitutional violations, federal courts "must consider whether the constrictions that prison administrators have placed on inmates' rights are justified by legitimate institutional concerns." *Gunter*, 917 F.2d at 1099. Federal courts must give great deference to the judgment exercised by prison administrator in attempting to strike a balance between the demands of institutional security and the constitutional rights of prisoners.[7] As the Eighth Circuit pointed out in *Gunter*:

> Such a balancing act is an exceedingly complex task, and not one easily undertaken by the courts, whose expertise in the imperatives of institutional security is slight and in no way approaches that of the professional administrators charged with the awesome task of running our prisons.

*Id.* at 1099.

The deference owed to determinations of prison officials in the interest of security was

---

7. In *Turner*, the United States Supreme Court indicated that the deference to be accorded prison officials derives in part from separation of powers principles:

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.

*Turner*, 482 U.S. at 84–85, 107 S.Ct. at 2259. *See also Iron Eyes v. Henry*, 907 F.2d 810, 812 (8th Cir.1990) ("[I]ssues of prison management are, both by reason of separation of powers and highly practical considerations of judicial competence, peculiarly ill-suited to judicial resolution. . . .") (citations omitted); *Lopez v. Robinson*, 914 F.2d 486, 490 (4th Cir.1990) (The United States Supreme Court "has persistently reminded lower courts that considerations of separation of powers and institutional competence suggest the need for judicial restraint.").

recently reinforced by the United States Court of Appeals for the Eighth Circuit in *Falls v. Nesbitt*, 966 F.2d 375 (8th Cir.1992). In *Nesbitt*, the court stated "[i]t is fundamental that prison administrators are accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 379 (citing *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979)).

■ This wide-ranging deference to the determinations of prison administrators is not boundless. "It is equally certain that '[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution.'" *Abbott*, 490 U.S. at 407, 109 S.Ct. at 1878 (quoting *Turner*, 482 U.S. at 84, 107 S.Ct. at 2259). In discharging their duties, federal courts must protect the constitutional rights of prison inmates in the face of a prison regulation or practice which offends a fundamental constitutional guarantee.[8] *Johnson v. Avery*, 393 U.S. 483, 486, 89 S.Ct. 747, 749, 21 L.Ed.2d 718 (1969); *Procunier v. Martinez*, 416 U.S. 396, 405–06, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224 (1974), *overruled in part by Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *Turner*, 482 U.S. at 84, 107 S.Ct. at 2259.

With these general principles in mind, the court will now address the appropriate standard to be applied to Sisneros' assertion that the English-only rule violates his First Amendment rights.

### 2. The reasonable relationship test

■ This court's analysis of Sisneros' First Amendment claims is governed by the Supreme Court's decisions in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and *Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). A prison rule or regulation which impinges upon an inmate's constitutional rights is valid "if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89, 107 S.Ct. at 2261.[9] In adopting the "reasonable relationship" test, Justice O'Connor observed "[o]ur task ... is to formulate a standard of review of prisoners' constitutional claims that is responsive both to the 'policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights.'" *Id.* at 85, 107 S.Ct. at 2259 (quoting *Martinez*, 416 U.S. at 406, 94 S.Ct. at 1808).

The Court opined in *Turner* that the "reasonable relationship" test was necessary

if "prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations." Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decision making process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevi-

---

8. Further, the role of the First Amendment is unique and important within the prison environment. *Nichols*, 810 F.Supp. at 1462. The isolation of prison life, the lack of contact with the outside world, and the lack of intellectual stimulation increases the importance of reading and writing in the prison context. *Id.* Within this isolation, the tendency to silence unpopular or unfavorable views is much greater than that outside the prison walls. *Id.* at 1461. Balancing the constitutional rights of inmates, the necessary deference to the prison administration's decisions regarding prison security, and the role of the First Amendment within the prison setting factor into the applicable standard of review.

9. The "reasonable relationship" test was crafted when reviewing constitutional challenges to two

Missouri prison regulations. The court upheld the constitutionality of a Missouri Division of Corrections regulation that generally restricted correspondence between inmates at different institutions within the division's jurisdiction. *Turner*, 482 U.S. at 91–93, 107 S.Ct. at 2262–2264. The second regulation prohibited inmates from marrying unless the prison superintendent had approved the marriage after finding there were compelling reasons for doing so. The court invalidated this regulation as unduly burdening the constitutional right to marry under *Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). *Id.* 482 U.S. at 94–99, 107 S.Ct. at 2265–2267.

tably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration."

*Id.* 482 U.S. at 89, 107 S.Ct. at 2261–2262 (citations omitted).

The "reasonable relationship" test articulated in *Turner* was subsequently applied in *Abbott* to uphold the facial validity of the Federal Bureau of Prison regulations restricting inmate access to certain publications.[10] *Abbott,* 490 U.S. at 404, 109 S.Ct. at 1876. In so holding, the Court specifically limited its earlier decision in *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40

L.Ed.2d 224 (1974).. *Martinez* held that the decisions of prison officials concerning censorship of inmates' incoming and· outgoing correspondence was subject to the "least restrictive means" test, *id.* at 404–14, 94 S.Ct. at 1807–12, a less deferential approach than the reasonable relationship test.[11] *Abbott* limited application of the least restrictive means test to prison regulations governing outgoing correspondence only. *Abbott,* 490 U.S. at 413, 109 S.Ct. at 1881.[12]

The Court applied the "reasonable relationship" test in *Abbott,* rather than the less deferential approach of *Martinez,* because of its concern

> that language in *Martinez* might be too readily understood as establishing a

10. In *Abbott,* the Court was primarily concerned with regulations set forth at 28 C.F.R. §§ 540.70 and 540.71 (1988). "These generally permit an inmate to subscribe to, or to receive, a publication without prior approval, but authorize the warden to reject a publication in certain circumstances. The warden may reject it 'only if it is determined detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal behavior.'" *Abbott,* 490 U.S. at 404, 109 S.Ct. at 1877 (citing 28 C.F.R. § 540.71(b)) (footnote omitted).

11. Under this standard, the *Martinez* court invalidated a prison regulation that authorized censorship of inmate correspondence that "unduly complained" or "magnified grievances" or was an expression of "inflammatory political, religious, or other views," or was otherwise "inappropriate." *Id.* 416 U.S. at 415, 94 S.Ct. at 1812. The Court concluded that the prison officials had "failed to show that these broad restrictions on prisoner mail were in any way necessary to the furtherance of a government interest unrelated to the suppression of expression." *Id.*

12. Previously, this court noted that *Abbott's* limitation of the *Martinez* standard to outgoing correspondence only was a substantial departure from the existing case law among the lower federal courts. *Nichols v. Nix,* 810 F.Supp. at 1457–58 n. 16. In fact, of the ten circuits which considered the issue, each had continued to apply ·the *Martinez* standard to incoming mail, even after *Turner. Id.* More recently in *Smith v. Delo,* 995 F.2d 827 (8th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 710, 126 L.Ed.2d 676 (1994) the court indicated that:

> Martinez is limited to outgoing correspondence when deciding the degree of security risk involved.... [I]t appears that *Martinez* should not be understood as establishing a special test that applies only when evaluating the constitutionality of regulations governing

outgoing mail. *Martinez* should be understood as striking down the regulation because it was not rationally related to a legitimate and neutral penological objective and because the regulation went further than necessary to serve valid governmental interests. This is not different from the analysis mandated by *Turner. Smith,* 995 F.2d at 830. *Smith* was a 2–1 decision. Judge Morris Sheppard Arnold dissented and stated:

> While *Martinez* does not impose a "least restrictive means" test on prison regulation of outgoing mail, it does require that a regulation's "limitation of [inmates'] First Amendment freedoms must be no greater than· is necessary or essential to the protection of the particular governmental interest involved." *Martinez,* 416 U.S. at 413, 94 S.Ct. at 1811. In other words, it requires that the challenged regulation be "generally necessary" to a legitimate government interest. *Thornburgh v. Abbott,* 490 U.S. at 411, 109 S.Ct. at 1880 (citing *Martinez,* 416 U.S. at 414, 94 S.Ct. at 1811).

> . ·. . . .

> The same type of regulation considered generally necessary to screen incoming mail can hardly be considered generally necessary to screen outgoing mail because the former admittedly poses a far greater threat to prison security than does the latter.

*Id.* at 832–33.

*See also Loggins v. Delo,* 999 F.2d 364, 367 (8th Cir.1993) (letter by prison inmate to brother stating that "[t]here's a beetled eye'd bit—back here who enjoys reading people's mail" and "was hoping to read a letter someone wrote to their wife talking dirty sh—, so she could go to the bathroom and masturbate" did not implicate "security concerns" and, thus, the imposition of discipline violated the First Amendment.). The court noted that "[b]y focusing on the degree of risk involved, the district court properly analyzed the claim under *Martinez." Id.* at 367.

standard of "strict" or "heightened" scrutiny, and that such a strict standard simply was not appropriate for consideration of regulations that are centrally concerned with the maintenance of order and security within prisons. Specifically, the Court declined to apply the *Martinez* standard in "prisoners' rights" cases because, as was noted in *Turner*, *Martinez* could be (and has been) read to require a strict "least restrictive alternative" analysis, without sufficient sensitivity to the need for discretion in meeting legitimate prison needs. The Court expressed concern that "every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand," and rejected the costs of a "least restrictive alternative" rule as too high.

*Abbott*, 490 U.S. at 409–11, 109 S.Ct. at 1879–80 (footnote and citations omitted).[13] Although the *Turner* test reflects the need to accord appropriate deference to prison officials, *see O'Lone v. Estate of Shabazz*, 482 U.S. 342–349, 107 S.Ct. 2400, 2404, 96

L.Ed.2d 282 (1987), its "reasonableness standard is not [a] toothless [one]." *Abbott*, 490 U.S. at 414, 109 S.Ct. at 1882; *Goodwin v. Turner*, 908 F.2d 1395, 1403 (8th Cir.1990).

■ In articulating the "reasonable relationship" test, the Court in *Turner* canvassed its earlier "prisoners' rights" cases,[14] and "identified several factors that are relevant to, and that serve to channel, the reasonableness inquiry." *Abbott*, 490 U.S. at 414, 109 S.Ct. at 1882. These four factors are: (1) whether there is a rational connection between the restriction and the legitimate governmental interest used to justify it; (2) whether alternative avenues of exercising the right remain open to the inmate; (3) whether accommodation of the right will have an adverse impact on guards, other inmates and prison resources generally; and (4) whether obvious, easy alternatives to the restriction exist. *Turner*, 482 U.S. at 89–90, 107 S.Ct. at 2261–62; *Abbott*, 490 U.S. at 414–18, 109 S.Ct. at 1882–84; *Blaise v. Fenn*, 48 F.3d 337, 339 (8th Cir.1995); *Thongvanh v. Thalacker*, 17 F.3d 256, 258 (8th Cir.1994); *Smith v. Delo*, 995 F.2d 827, 829 (8th Cir. 1993).[15]

13. *Abbott* was a six-three decision with Justices Stevens, Brennan and Marshall concurring in part and dissenting in part. Justice Stevens' opinion concurring in part and dissenting in part was particularly critical of the majority's opinion partially overruling *Martinez* by limiting its scope to outgoing mail and applying a reasonableness standard to incoming mail. Justice Stevens observed:

This peculiar bifurcation of the constitutional standard governing communications between inmates and outsiders is unjustified.... The Court today abandons *Martinez's* fundamental premise. In my opinion its suggestion that three later opinions applying reasonable standards warrant this departure is disingenuous.

The *Turner* opinion cited and quoted from *Martinez* more than 20 times; not once did it disapprove *Martinez's* holding, its standard, or its recognition of a special interest in protecting the First Amendment rights of those who are *not* prisoners. Notwithstanding, today the Court abandons the premise on which *Martinez* was grounded. This casual discarding of 'the secure foundation' of considered precedent ill serves the orderly development of the law.

*Abbott*, 490 U.S. at 424–27, 109 S.Ct. at 1887–89. (citations omitted) (Stevens, J. concurring in part and dissenting in part).

14. The earlier "prisoners' rights" cases analyzed in *Turner* are *Martinez*, 416 U.S. at 396, 94 S.Ct. at 1803 (constitutional challenge to prison regulations relating to the censorship of prisoners' incoming and outgoing personal mail, and restricting access to prisoners by legal assistants and law students seeking to conduct attorney-client interviews); *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (constitutional challenge to a prison regulation prohibiting face-to-face media interviews with individual inmates); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (constitutional challenge to prison regulations that prohibited meetings of a prisoners' labor union, inmate solicitation of other inmates to join the union, and bulk mailings concerning the union from outside sources); and *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (constitutional challenge to a Bureau of Prisons' regulation restricting inmates' receipt of hardback books unless mailed directly from publisher, book clubs or bookstores). *Turner*, 482 U.S. at 84–90, 107 S.Ct. at 2259–2262.

15. Decisions of the United States Court of Appeals for the Eighth Circuit, subsequent to the Court's holdings in *Turner* and *Abbott*, have routinely applied these four factors and the "reasonably related to a legitimate penological interest"

Both the United States Supreme Court and the Eighth Circuit Court of Appeals have emphasized that "[t]his examination focuses upon whether the regulation is rationally related to a legitimate and neutral objective." *Washington v. Harper*, 494 U.S. 210, 223, 110 S.Ct. 1028, 1037, 108 L.Ed.2d 178 (1990); *Smith v. Delo*, 995 F.2d at 829 (citing *Abbott*, 490 U.S. at 414, 109 S.Ct. at 1882). This standard must be applied even when the "constitutional right claimed to have been infringed is fundamental, and the State under other circumstances would have been required to satisfy a more rigorous standard of review." *Harper*, 494 U.S. at 223, 110 S.Ct. at 1037; *Goodwin v. Turner*, 908 F.2d 1395, 1398–99 (8th Cir.1990).

It is in the context of this "reasonable relationship" test that Sisneros' facial and as applied constitutional challenge to the English-only rule must be measured. Because Sisneros challenges the English-only restriction both on its face and as applied, the court will address each claim separately.

### B. Application of the Reasonable Relationship Test

#### 1. Facial Constitutional Challenge

Sisneros' constitutional challenge seeks to invalidate the Iowa Administrative Code provision and the ISP policy which prohibits letters written in a language other than English, unless such correspondence is excepted with approval of the appropriate official. Sisneros' claim is that the regulations violate his First Amendment right to free speech and his Fourteenth Amendment right to equal protection.

Before turning to the merits of Sisneros' claim that the English-only rule is unconstitutional, the court notes that his heavy reliance upon *Ramos v. Lamm*, 639 F.2d 559, 581 (10th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981), is misplaced. In *Lamm*, the Tenth Circuit held that a prison policy prohibiting delivery of mail written in a foreign language was unconstitutional as applied. *Lamm* is readily distinguishable from this litigation. First, *Lamm* was decided under the *Martinez* less deferential "least restrictive" means test, *Martinez*, 416 U.S. at 404–14, 94 S.Ct. at 1807–12, which has been replaced by the reasonable relationship test. More importantly, a significant number of inmates at the Colorado State Penitentiary in Canyon City, Colorado, referred to as "Old Max", the institution at issue in *Lamm*, did not speak, read or write in English. Rather, Spanish was the only language by which they could communicate. *Lamm*, 639 F.2d at 581. Moreover, it appears the regulation in question in *Lamm* did not provide any exception for inmates where Spanish was the only language they could speak, read or write. *Id.*[16]

test to determine whether prison regulations impermissibly impinge on prisoners' constitutional rights. *See, e.g., Smith v. Delo*, 995 F.2d 827, 830–32 (8th Cir.1993) (inmate challenged prison regulation requiring outgoing mail to news organizations or religious groups be sent to prison mailroom unsealed for inspection), *cert. denied*, —— U.S. ——, 114 S.Ct. 710, 126 L.Ed.2d 676 (1994); *Dawson v. Scurr*, 986 F.2d 257, 260–61 (8th Cir.) (inmate challenged restriction on the viewing of sexually explicit materials), *cert. denied sum nom. Shearon v. Lynch*, —— U.S. ——, 114 S.Ct. 232, 126 L.Ed.2d 187 (1993); *Abdullah v. Gunter*, 949 F.2d 1032, 1035 (8th Cir.1991), *cert. denied*, 504 U.S. 930, 112 S.Ct. 1995, 118 L.Ed.2d 591 (1992) (inmate challenged prison policy which prohibited prisoners from making religious donations); *Griffin v. Lombardi*, 946 F.2d 604, 607 (8th Cir.1991) (inmate brought action against prison officials for refusing to deliver his original diploma and transcripts); *Goodwin v. Turner*, 908 F.2d 1395, 1399 (8th Cir.1990) (inmate sought habeas corpus relief after denial of his request that he be permitted to artificially inseminate his wife); *Iron Eyes v. Henry*, 907 F.2d 810, 813 (8th Cir.1990) (Native American inmate sought relief against enforcement of rule requiring all prisoners to wear their hair above their collars); *Salaam v. Lockhart*, 905 F.2d 1168, 1170–71 (8th Cir.1990) (inmate who changed his name after imprisonment challenged prison's "committed name" policy), *cert. denied*, 498 U.S. 1026, 111 S.Ct. 677, 112 L.Ed.2d 669 (1991); *Blankenship v. Gunter*, 898 F.2d 625, 627 (8th Cir.1990) (inmate challenged prison policy which prohibited prisoners from making religious donations); *Smith v. Erickson*, 884 F.2d 1108, 1110 (8th Cir.1989) (inmate sought to have prison officials enjoined from enforcing prison-canteen-only-envelope policy, refusing to mail legal correspondence, and refusing to supply free postage and envelopes.).

16. The district court opinion in *Lamm* noted that because nearly one-third of the inmates at Old Max were Hispanic, "if prison officials are concerned that secret messages might be passed in Spanish, it is incumbent on a state with such a large Hispanic population to utilize a person capable of understanding Spanish to perform the

■ The first factor in the reasonable relationship test is whether the governmental objective behind the regulation is legitimate and neutral, and whether the regulation is rationally related to that objective. *Abbott,* 490 U.S. at 414, 109 S.Ct. at 1882. To put it another way, analysis of the first *Turner* factor is twofold: (1) is the objective underlying the regulation or policy neutral and legitimate; and (2) is the regulation or policy rationally related to that objective. *Id.* Security is clearly a valid penological interest, *O'Lone,* 482 U.S. at 348, 107 S.Ct. at 2404; *Abbott,* 490 U.S. at 415, 109 S.Ct. at 1882; *Dawson v. Scurr,* 986 F.2d 257, 260 (8th Cir.1993), as is rehabilitation. *Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974); *Dawson,* 986 F.2d at 260. The prison's interest in treating all inmates equally is also a legitimate penological interest. *Goodwin,* 908 F.2d at 1399. The neutrality requirement of this factor in the *Turner* analysis is met if the regulation furthers "an important or substantial governmental interest unrelated to the suppression of expression." *Abbott,* 490 U.S. at 415, 109 S.Ct. at 1882; *Dawson,* 986 F.2d at 261. Thus, when prison administrators distinguish between communications on the basis of their potential implications for prison security and rehabilitation, their regulation is "neutral." *Dawson,* 986 F.2d at 261 (citing *Abbott,* 490 U.S. at 415–16, 109 S.Ct. at 1882–83). Turning to the relationship between the interest and the regulation, the rational relationship between regulation of communications and security is apparent because "only by discovering the contents of [communications] can prison officials insure that [a communication] containing improper matters is not sent outside the prison." *Smith v. Delo,* 995 F.2d at 830.

Applying this factor here, the court concludes, first, that the government's purpose in promulgating the regulation is unquestionably legitimate. The express purpose of the ISP prison policy is to protect prison security, a purpose which is central to all correction goals. Second, as to neutrality, the English-only policy does not suppress expression, but merely goes to the form of that expression. The rational relationship between the ability of prison officials to monitor the prisoner's correspondence and the security of the prison here is as apparent as it was in *Smith v. Delo,* 995 F.2d at 830.

The second factor under the reasonable relationship test is whether alternative means of exercising that right are available to the inmates. *Abbott,* 490 U.S. at 417, 109 S.Ct. at 1883. In considering this factor, the right in question "must be viewed sensibly and expansively." *Id.; Dawson,* 986 F.2d at 261. It is particularly on this prong of the analysis that "courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials ... in gauging the validity of the regulation.'" *Dawson,* 986 F.2d at 261 (quoting *Turner,* 482 U.S. at 90, 107 S.Ct. at 2262). Thus, the question is not whether there are alternatives for the specific activity the inmate desires to pursue, but whether they have other avenues for exercising the right when that right is "viewed expansively." For example, in *Dawson,* the court concluded that there were alternatives to exercise of first amendment privileges where regulations "permit[ted] a broad range of publications to be sent, received and read," even though the regulation forbade certain inmates certain sexually explicit materials. *Dawson,* 986 F.2d at 261. Similarly, in *Iron Eyes v. Henry,* 907 F.2d 810 (8th Cir.1990), the court rejected a "narrow definition" of "the right" at issue as the right of a Native American Indian to wear his hair long, which was one tenet of his religion; rather, the court concluded that this factor weighed in favor of the regulation at issue where the regulation did not preclude the plaintiff from "practicing some of the tenets of his religion." *Iron Eyes,* 907 F.2d at 815.[17] Thus, this factor

---

censoring function or else forego it." *Ramos v. Lamm,* 485 F.Supp. 122, 164 (D.Colo.1979), *aff'd in part and rev'd in part,* 639 F.2d 559 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981).

**17.** The court in *Iron Eyes* remarked further that "certainly, the short hair regulation places hardship on Iron Eyes, but by breaking the law, a prisoner brings upon himself 'the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations

focuses on the extent the inmate has been deprived of the asserted right, but this circuit's court of appeals has concluded that the inmate's deprivation must be balanced against the extent to which prison policy would have to be compromised or the extent of expenditures of prison resources the prison would be required to make in accommodating the right. *Goodwin*, 908 F.2d at 1400.

The English-only regulation has an exception for inmates who do not speak or write English and inmates may appeal to prison officials in light of exceptional circumstances. Also, inmates similarly situated to Sisneros, who can read and write English, have the option of writing their correspondence in English and having it translated by persons or organizations outside the Iowa correctional system. *See, e.g., Thongvanh v. Thalacker*, 17 F.3d 256 (8th Cir.1994) (Laotian inmate at the Iowa State Penitentiary in Anamosa, Iowa, allowed to use the Iowa Refugee Center for translating Lao correspondence). The court concludes that there are sufficient alternatives available for the exercise of Sisneros' right to communicate with his relatives, even in their own language, for this regulation to meet this second factor of the *Turner* analysis.

The third consideration outlined by *Turner* is whether accommodation of the asserted right will have any adverse impact on other inmates, guards, and prison resources. *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262. The Eighth Circuit Court of Appeals has characterized the analysis of this factor as "examin[ing] the impact on non-prisoners if the regulation were struck down." *Smith v. Delo*, 995 F.2d at 831. Where striking down the regulation would have a tremendous impact on prison officials, and potentially a strong impact on others in or outside of the prison, then the regulation should be upheld. *Id.* In considering this factor in the *Turner* analysis, the Eighth Circuit Court of Appeals has also considered whether accommodation would require additional expenses for the prison, create a tremendous administrative

burden, or require inordinate amounts of administrative staff time, all of which weigh in favor of the regulation. *Dawson*, 986 F.2d at 262; *Iron Eyes*, 907 F.2d at 815. Additionally, where accommodation increases the risk to guards, or where it could create prisoner friction and unrest within the facility as the result of giving, or appearing to give, special treatment to one group of prisoners, this factor also weighs in favor of the regulation. *Iron Eyes*, 907 F.2d at 815.

In the present case, if prison officials cannot monitor inmate correspondence because they cannot read or understand it, prison security suffers. The right to correspond in a foreign language could be allowed but "can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike." *Turner*, 482 U.S. at 92, 107 S.Ct. at 2263. Because the ISP does not appear to have staff who could readily monitor communications in either Spanish or Apache, it seems likely that accommodating Sisneros' desire to communicate in those languages could place a significant burden on prison resources or require an unacceptable amount of staff time.

The fourth factor in the reasonable relationship test is whether an obvious, easy alternative to the current regulation exists, and if one does exist, if it can be implemented at a *de minimis* cost to valid penological interests. *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262; *Iron Eyes*, 907 F.2d at 815. "[T]he absence of ready alternatives is evidence of the reasonableness of the regulation." *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262. Conversely, obvious and less obtrusive options lead to questions as to the reasonableness of the regulation and the actual purpose of the policy. *Id.* "[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.; Dawson*, 986 F.2d at 262. However, where alternatives to the regulation come at more that a *de minimis* cost to valid penological inter-

---

underlying our penal system.' " *Iron Eyes*, 907 F.2d at 815 (quoting *O'Lone*, 482 U.S. at 348, 107 S.Ct. at 2404). The court found that although the inmate could not pursue certain practices of his religion, "including the ghost dance,

the use of a sweat lodge, and allowing one's hair to grow," he could pursue others, such as "meeting with other Native Americans to perform pipe ceremonies and the sun dance." *Id.*

ests, the regulation should be upheld. *Iron Eyes,* 907 F.2d at 815–16.

The English-only rule appears to be a valid, cost-effective response to a security concern, and not an exaggerated response. It would be costly for ISP to hire interpreters to read foreign language correspondence and, thus, effectively maintain the security at ISP. While there may be alternative options available to the ISP officials, *see, e.g., Thongvanh,* 17 F.3d at 259, Sisneros has failed to adduce evidence on this question and has, thus, failed to establish the existence of ready alternatives.

Therefore, applying the four factors of the reasonable relationship test to the English-only regulation, the court concludes that the English-only regulation is facially constitutional. The court turns next to Sisneros' "as applied" challenge to the regulation.

### 2. "As Applied" Constitutional Challenge

■ Sisneros also challenges the application of the regulation. While the same factors in *Turner* guide this analysis of the reasonable relationship test to the English-only ISP regulation, this "as applied" challenge is different:

> [b]ecause the *Abbott–Turner* factors were developed in a case which presented only a facial constitutional challenge, they do not always lend themselves to an "as applied" analysis. Their usefulness is dependent upon the given factors of a given case. Accordingly the court will address those factors most applicable and helpful to its analysis.

*Nichols,* 810 F.Supp. at 1462.

The first factor in the *Turner* analysis of Sisneros' "as applied" challenge is, once again, the government's objective underlying the regulation, its legitimacy and neutrality, and the regulation's rational relation to its objective. The court has already upheld the ISP English-only regulation based on its reasonable relationship to legitimate institution-

al concerns regarding security. The regulation is in place to detect information about escape plans, threats, and illegal activities. These same concerns are addressed in *Turner,* where the Court upheld a regulation which banned correspondence between inmates of different institutions. *Turner,* 482 U.S. at 91, 107 S.Ct. at 2262.

As the court observed in *Smith v. Delo,* 995 F.2d at 830, "it is apparent that the regulation at issue is reasonably related to this legitimate purpose; only by discovering the contents of the mail can prison officials insure that mail containing improper matters is not sent outside the prison." (footnote omitted). Additionally, "prison officials do not need to wait for problems to occur before addressing them; prison officials are entitled to act preemptively in order to prevent problems from occurring in the first place." *Id.* at 831.

In terms of neutrality, the English-only regulation at issue does not make a distinction between correspondence based on content. The English-only rule makes no distinction based on the substance of the ideas or thoughts contained in the correspondence. Rather, the restriction is only on the form of the communication. In *Abbott,* the Court upheld prison regulations which made distinctions between various publications based solely on the different potential security implications.[18] *Abbott,* 490 U.S. at 415–16, 109 S.Ct. at 1882–83. Although these distinctions are somewhat content based, the Supreme Court finds them to be " 'neutral' in the technical sense in which we meant and used that term in *Turner.*" *Id.* In the present case, the regulation distinguishes between inmate correspondence based solely on the security implications of the correspondence. If the correspondence is not in English, it cannot be understood by prison officials and thereby creates a threat to the security of the institution. The information could contain information regarding illegal activities, escape attempts, or threats to oth-

---

18. The Supreme Court upheld the constitutionality of prison regulations which prohibited prisoners from receiving certain publications. *Abbott,* 490 U.S. at 415–16, 109 S.Ct. at 1882–83. Under the regulations, prison officials could not reject a publication "solely because its context [wa]s religious, philosophical, political, social or sexual, or because its content [wa]s unpopular or repugnant," but could reject it if the publication constituted a threat to security. *Id.*

ers, all threats to prison security. The requirement that all correspondence be written in English is logically related to the prison officials' ability to monitor the mail and maintain order in the prison. A valid, neutral connection between the regulation and the governmental objective is achieved.

The second *Abbott–Turner* factor of the reasonable relationship test is whether there are alternative means of exercising the right at issue. The most obvious alternative means for the exercise of Sisneros' right to communicate with his relatives is for him to write them in English. Sisneros has relatives who speak English and there is no showing in the record that these relatives cannot translate Sisneros' letters written in English to Spanish or Apache. Moreover, there is no showing in the record that the relatives with whom Sisneros seeks to communicate in Spanish and Apache do not have access to individuals who could interpret letters written by Sisneros in English. Thus, the court concludes that there are alternative means for Sisneros to exercise his right to communicate with his Spanish and Apache speaking relatives in the Southwest.

The third *Abbott–Turner* factor is the impact the accommodation of this right will have on the inmates, the guards and the prison as a whole. *Turner,* 482 U.S. at 90, 107 S.Ct. at 2262; *Abbott,* 490 U.S. at 418, 109 S.Ct. at 1884. The Eighth Circuit Court of Appeals has held that the inability to monitor inmate correspondence "has a tremendous impact on prison officials, who have a strong interest in preventing, deterring, and discovering escape plans." *Smith v. Delo,* 995 F.2d at 831. In addition, unmonitored mail would also "have a strong impact on anyone receiving a threat from an inmate." *Id.* The prison administration's loss of control would lead to a deterioration of the overall safety and stability of the prison environment, thus affecting the prison population as a whole. Therefore, the right in question "can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike." *Turner,* 482 U.S. at 92, 107 S.Ct. at 2263.

Finally, under the fourth *Abbott–Turner* factor, the court is required to explore whether obvious, easy alternatives to the restriction exist. "The existence of [such] alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Turner,* 482 U.S. at 90, 107 S.Ct. at 2262. A prison regulation does not have to pass a "least restrictive alternative" test, but "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at a *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Turner,* 482 U.S. at 90–91, 107 S.Ct. at 2262. Sisneros has offered no reasonable alternative to the English-only policy that would not pose a significant cost to the prison. The Supreme Court has held that the monitoring of prison correspondence clearly imposes "more than a *de minimis* cost on the pursuit of legitimate correction goals." *Id.* at 93, 107 S.Ct. at 2264. While there may be other reasonable alternatives, Sisneros failed to establish them.

While this case was pending, the Eighth Circuit decided *Thongvanh v. Thalacker,* 17 F.3d 256 (8th Cir.1994). In *Thongvanh,* the Circuit affirmed a jury verdict in favor of Plaintiff Khamfeuang Thongvanh, a Laotian inmate at the Iowa Men's Reformatory in Anamosa, Iowa, that his First Amendment rights were violated by the application of the English-only rule. In affirming the judgment for the Plaintiff, the Eighth Circuit Court of Appeals observed, after listing the four *Turner* factors, that:

> In this case, there was evidence that one German-speaking and several Spanish-speaking inmates were excepted from the "English-only" rule. While translating these letters was certainly more convenient for the IMR than correspondence in Lao, there was a ready alternative with respect to translating Lao correspondence at the Iowa Refugee Center. There was no explanation as to why all correspondence in Lao could not have been routed through the Refugee Service Center. Prison officials testified that the Lao-to-English translation service provided by the Refugee Service Center was cost-free to

the IMR. Furthermore, testimony of prison officials was that, while all correspondence was scanned and checked for contraband, only randomly selected letters—whether in English or another language—were actually read by prison officials.

*Thongvanh*, 17 F.3d at 259. The proof in this litigation differs critically from that in *Thongvanh*.

In *Thongvanh*, the plaintiff established the existence of "a ready alternative" with respect to translating the foreign language correspondence. *Thongvanh*, 17 F.3d at 259. *Thongvanh* established that the Iowa Refugee Center was available to provide translation service from Lao to English cost-free to the Iowa Men's Reformatory. *Id.* In the present litigation Sisneros failed to offer any evidence of reasonable alternatives. While the court could undoubtedly speculate as to a myriad of reasonable alternatives for the translation of Spanish, and to a lesser extent, Apache, the court is unwilling to do so. It was Sisneros' obligation to offer proof of a "ready alternative"—and he failed to do so. Thus, Sisneros' claim is distinguishable from *Thongvanh*. While the Eighth Circuit's recent decision in *Thongvanh* is strong support for Sisneros' as applied constitutional contention—his failure of proof on the existence of reasonable alternatives distinguishes this case from the holding in *Thongvanh*.

█ Therefore, utilizing the four factors of the reasonable relationship test as applied to the restrictions on Sisneros' foreign language correspondence, the court holds that the English-only regulation is constitutional as applied. The restrictions imposed on Sisneros by defendants Nix and Hedgepeth are reasonably related to the legitimate penological interest of security.[19]

## V. CONSTITUTIONALITY OF SISNEROS' TRANSFER
### (Including Some Ultimate Findings Of Fact)

### A. Introduction

█ Sisneros asserts he was impermissibly transferred to Arizona in retaliation for exercising his First Amendment rights to pursue inmate grievances and file suit against ISP officials. It is now well settled law that "[p]rison officials may not retaliate against an inmate for filing legal actions in the exercise of his constitutional right of access to the courts." *Goff v. Burton*, 7 F.3d 734, 736 (8th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2684, 129 L.Ed.2d 817 (1994); *Goff v. Dailey*, 991 F.2d 1437, 1439 (8th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 564, 126 L.Ed.2d 464 (1993); *Ponchik v. Bogan*, 929 F.2d 419, 420 (8th Cir.1991); *Sanders v. St. Louis County*, 724 F.2d 665, 666 (8th Cir. 1983) (citations omitted). This prohibition of retaliation by prison officials includes inmate grievances as well as legal actions. *Orebaugh v. Caspari*, 910 F.2d 526, 528 (8th Cir.1990); *Sprouse v. Babcock*, 870 F.2d 450, 452 (8th Cir.1989) ("That the Constitution does not obligate the state to establish a grievance procedure is, we believe, of no consequence here, since what is at stake is a prisoner's right to access to an existing grievance procedure without fear of being subjected to a retaliatory disciplinary action.") Indeed, the Eighth Circuit Court of Appeals recently held that "a threat of retaliation is sufficient injury [to sustain a First Amendment claim] if made in retaliation for an inmate's use of prison grievance procedures." *Burgess v. Moore*, 39 F.3d 216, 218 (8th Cir.1994) (citing *Dixon v. Brown*, 38

---

19. In addition to his First Amendment claim, Sisneros also contends that the English-only policy is violative of the Equal Protection Clause of the Fourteenth Amendment. Although the *Turner–Abbott* standard was developed in the context of First Amendment issues, courts have more recently concluded that "it is also relevant to the assessment of equal protection claims in the prison setting." *Benjamin v. Coughlin*, 905 F.2d 571, 575 (2d Cir.), *cert. denied*, 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990); *see Salaam v. Collins*, 830 F.Supp. 853, 857 (D.Md.1993); *Grif-*

*fin v. Coughlin*, 743 F.Supp. 1006, 1011 (N.D.N.Y.1990); *Doe v. Sparks*, 733 F.Supp. 227, 233–34 (W.D.Pa.1990); *cf. Williams v. Lane*, 851 F.2d 867, 881 (7th Cir.1988), *cert. denied*, 488 U.S. 1047, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989) (holding that "[u]nequal treatment among inmates ... is justified if it bears a rational relationship to legitimate penal interest"). Here, for the reasons expressed above, because the English-only regulation at issue passes muster under the *Abbott–Turner* standard, Sisneros has not been denied equal protection under the law.

F.3d 379 (8th Cir.1994); *Sanders v. St. Louis County,* 724 F.2d 665, 666 (8th Cir.1983)).

■ Although Sisneros, like other prisoners, "enjoys no constitutional right to remain in a particular institution," *Goff,* 7 F.3d at 737 (quoting *Murphy v. Missouri Dep't of Correction,* 769 F.2d 502, 503 (8th Cir.1985)), and although generally prison officials "may transfer a prisoner 'for whatever reason or for no reason at all,'" *Goff,* 7 F.3d at 737 (citing *Olim v. Wakinekona,* 461 U.S. 238, 250, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983) quoting *Meachum v. Fano,* 427 U.S. 215, 228, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976)), "a prisoner cannot be transferred in retaliation for the exercise of a constitutional right." *Goff,* 7 F.3d at 737; *Ponchik,* 929 F.2d at 420); *Murphy,* 769 F.2d at 503; *Garland v. Polley,* 594 F.2d 1220, 1223 (8th Cir.1979).

### B. Appropriate Standard for Analyzing Sisneros' Claim of Retaliatory Transfer

■ Any confusion concerning the appropriate standard to be applied to an inmate's claim of retaliatory transfer has been clearly dispelled by the Eighth Circuit's recent holding in *Goff v. Burton,* 7 F.3d 734, 737–38 (8th Cir.1993). In *Goff,* the court recognized at the outset that:

> [i]n raising a retaliatory transfer claim, the prisoner must "'face a substantial burden in attempting to prove that the actual motivating factor for his transfer'" was the impermissible retaliation. *Murphy,* 769 F.2d at 503 n. 1 (quoting *McDonald v. Hall,* 610 F.2d 16, 18 (1st Cir.1979)).

*Goff,* 7 F.3d at 737. In *Goff,* the court went on to observe that "while acknowledging *Mount Healthy [City School Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) ], this court has consistently applied the 'but for' standard in cases involving a prisoner's claim of impermissible retaliatory transfer by prison officials rather than applying a burden-shifting analysis." *Goff,* 7 F.3d at 737–38. In so holding, the court made clear that the *Mount Healthy* approach, in which the Plaintiff has the initial burden of showing that his constitutionally protected conduct was a motivating factor in

the adverse decision, with the burden then shifting to the defendant to prove by a preponderance of the evidence that it would have reached the same decision in the absence of protected conduct, was not the standard to be utilized in prisoner retaliatory transfer claims. *Id.* The utilization of the *Mount Healthy* burden-shifting analysis is in error "by inappropriately placing the burden of proof upon the prison officials." *Id.* at 738. Rather, as *Goff* makes clear "the burden is on the prisoner to prove that but for an unconstitutional, retaliatory motive the transfer would have not occurred." *Id.* at 738.

### C. Was Sisneros' Transfer Retaliatory?

■ Using the "but for" standard articulated in *Goff,* the court concludes that Sisneros has carried his burden of proof in establishing a retaliatory transfer. But for the officials' unconstitutional retaliatory motive, Sisneros would not have been transferred back to Arizona. Specifically, the court concludes that Sisneros was transferred in retaliation for his exercise of the right to utilize the prison grievance procedure and his filing of lawsuits against ISP officials. As the court previously noted, Sisneros had no disciplinary record while at ISP. Hedgepeth and Nix clearly stated that they transferred Sisneros because he was "unhappy," "obnoxious," and "ungracious." The only factual basis for these observations by Nix and Hedgepeth concerning Sisneros were his complaints about the English-only rule and his complaints about whether he had sufficient Native American blood to be included within the terms of a consent decree in the *Walker* litigation. Hedgepeth specifically acknowledged that Sisneros pursued both of these "complaints" by first filing grievances and then filing two lawsuits.

The record evidence in the form of Hedgepeth's deposition is compelling on this question of defendants' retaliatory motive for transferring Sisneros. Hedgepeth was asked to define what he meant by his statement that Sisneros was obnoxious:

> Q But what you mean by obnoxious is he was complaining about things here?

A Yes, complaining, obnoxious, I guess that they fall in the same category.[20]

Hedgepeth further elaborated on what he meant by obnoxious when he stated:

"you are a guest, if you don't like the way the rules are you could have asked to go back and if you don't like what we are doing here whether it be religious or the rules with respect to writing or anything else, it is just too bad, go back to Arizona, so go back there."[21]

Additionally, Hedgepeth believed Sisneros was "ungracious":

Q Okay. And again, I just want to make this clear so everybody understands, there is no other reason that you are aware of for returning him to Arizona other than he was ungracious here because he complained about the rulings?

A Yes, he was just an ungracious guest.[22]

Finally, Hedgepeth testified concerning the grievances filed by Sisneros as follows:

Q Is putting in grievances about potential violation of rights being ungracious?

A I didn't say it was.

Q But is it?

A Filing a grievance is not being ungracious, it is just being totally obnoxious....[23]

Warden Nix testified that Sisneros was returned to Arizona because he was "unhappy" at ISP. Warden Nix testified as follows:

Q Let's put it this way, was there any reason that you were unhappy with him other than his complaints about these matters that we have identified, that is the English only requirement and the Native American issues?

A I am saying that.

September 29, 1992 deposition of Crispus C. Nix, p. 75. Nix testified "he was unhappy about religion, about his communications, his inability to speak in Spanish."[24]

This case is therefore a most unusual one in which the court concludes that there has been a retaliatory transfer, because in all other such cases of which this court is aware, the record at least suggested that the transfer was the result of mixed motives or the proffer of a legitimate reason held to be pretextual. The court has made a thorough search of the record for a suggestion of a legitimate reason, but finds not a shred of evidence that Hedgepeth and Nix had any reason other than retaliation for transferring Sisneros from Iowa back to Arizona. There is simply no basis in this record for concluding that, in the absence of Sisneros' grievances and litigation activities, he would have been transferred from Iowa to Arizona. Indeed, the court concludes just the opposite. Defendants Hedgepeth and Nix retaliated against Sisneros by transferring him because he pursued inmate grievances and filed legal actions which were constitutionally protected.

Therefore, utilizing the standards set forth in *Goff*, 7 F.3d at 737–38, the court concludes that Sisneros has established that but for an unconstitutional, retaliatory motive, his transfer to Arizona from ISP would not have occurred. Thus, Nix and Hedgepeth violated Sisneros' First Amendment rights by their retaliatory transfer of Sisneros to Arizona.

## VI. QUALIFIED IMMUNITY

### A. Standards For Qualified Immunity

Having determined that defendants violated Sisneros' rights when they transferred him to Arizona in retaliation for filing grievances and lawsuits, the court must next consider whether defendants are entitled to raise qualified immunity as a defense to liability for such a retaliatory transfer. Defendants assert that they are entitled to qualified immunity because their decisions were reasonable based on their perception of the situation. Plaintiff counters the law as to both the English-only rule and retaliatory transfers was clearly established and defen-

---

**20.** September 29, 1992 deposition of Paul Hedgepeth, p. 55.

**21.** *Id.*

**22.** *Id.* at 61.

**23.** *Id.*

**24.** September 29, 1992 deposition of Crispus C. Nix, p. 70.

dants could not reasonably have believed that their conduct was not in violation of the law.

### 1. Scope and purpose of qualified immunity

The standard for qualified immunity is that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Bills v. Dahm*, 32 F.3d 333, 334 (8th Cir.1994); *Latimore v. Widseth*, 7 F.3d 709, 712 (8th Cir.1993) (*en banc*) (quoting *Jackson v. Rapps*, 947 F.2d 332, 338 (8th Cir. 1991), *cert. denied*, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 1124, 127 L.Ed.2d 433 (1994)); *Givens v. Jones*, 900 F.2d 1229, 1231–32 (8th Cir.1990) (quoting *Harlow*). "[T]o be clearly established, [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Bills*, 32 F.3d at 335; *Latimore*, 7 F.3d at 712; *Johnson–El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir.1989); *See also Anderson v. Creighton*, 483 U.S. 635, 640–41, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987). The shield of qualified immunity is breached if "the unlawfulness of the action [is] apparent in light of pre-existing law." *Bills*, 32 F.3d at 334–35. However, the Supreme Court has made clear that a plaintiff cannot defeat an official's claim of qualified immunity "'simply by alleging violation of extremely abstract rights.'" *Bills*, 32 F.3d at 335 (quoting *Anderson*, 483 U.S. at 639, 107 S.Ct. at 3038); *Givens*, 900 F.2d at 1232 (quoting *Anderson*, 483 U.S. at 639, 107 S.Ct. at 3038). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging a violation of extremely

abstract rights." *Anderson*, 483 U.S. at 639, 107 S.Ct. at 3039; *Latimore*, 7 F.3d at 712.

Case law dealing with qualified immunity reflects a conflict of competing interests. *Harlow*, 457 U.S. at 819, 102 S.Ct. at 2738; *Anderson*, 483 U.S. at 638, 107 S.Ct. at 3038; *Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967). Government officials must not be limited in their actions by fear of monetary damages and liability. *Harlow*, 457 U.S. at 807, 102 S.Ct. at 2732; *Pierson*, 386 U.S. at 554, 87 S.Ct. at 1217; *Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978). There are also concerns for imposing upon public officials the expense of defending insubstantial claims. *Harlow*, 457 U.S. at 808, 102 S.Ct. at 2732; *Butz*, 438 U.S. at 507–08, 98 S.Ct. at 2911–12. The social costs of continually defending public work include a subsequent diversion from future programs and the deterrence of qualified individuals from entering positions of public office. *Harlow*, 457 U.S. at 814, 102 S.Ct. at 2736. On the other hand, "[w]hen government officials abuse their offices, 'action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees.'" *Anderson*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (quoting *Harlow*, 457 U.S. at 814, 102 S.Ct. at 2736). Qualified immunity attempts to strike a balance between these concerns, providing "'ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)); *Anderson*, 483 U.S. at 638, 107 S.Ct. at 3038 (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").[25]

---

**25.** The Eighth Circuit has indicated that qualified immunity "represents an accommodation of competing social interests whereby officials who knowingly violate the law are held accountable while officials who reasonably perform their discretionary duties may act without the fear of a lawsuit imposing personal liability." *J.H.H. v.*

*O'Hara*, 878 F.2d 240, 243 (8th Cir.1989) (*en banc*) (citing *Arcoren v. Peters*, 829 F.2d 671, 678 (8th Cir.1987), *cert. denied*, 485 U.S. 987, 108 S.Ct. 1290, 99 L.Ed.2d 500 (1988)), *cert. denied*, 493 U.S. 1072, 110 S.Ct. 1117, 107 L.Ed.2d 1024 (1990).

The qualified immunity defense should fail if the official violates a clearly established right, because "a reasonably competent public official should know the law governing his conduct." *Slone,* 983 F.2d at 109 (quoting *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2738). It extends, however, to "a prison official who relies on a facially valid regulation unless he knows or should know that the regulation violates a well established constitutional right consisting of the particular act" he punishes or prohibits. *Wolfel v. Morris,* 972 F.2d 712, 719–20 (6th Cir.1992); *Cf. Cross,* 965 F.2d at 632 (official's conduct is protected if reasonable in light of the law and information official possessed at the time.).

 Qualified immunity is not just a defense, but an immunity to suit for money damages. *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985); *Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). Qualified immunity is a question of law which is usually determined by the court prior to trial. *Swenson v. Trickey,* 995 F.2d 132, 135 (8th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 568, 126 L.Ed.2d 468 (1993) (quoting *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991)). Qualified immunity must be asserted by the defendant, or the privilege is lost. *Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815. A denial of qualified immunity is immediately appealable. *Id.* at 526–27, 105 S.Ct. at 2815–16.

## 2. *The court's inquiry*

 Ordinarily, the court must make a three-part inquiry to determine whether the defendant is entitled to qualified immunity: First, it must determine whether the prisoner has asserted a violation of a constitutional right; second, whether the allegedly violated constitutional right was clearly established; and third, if, given the facts of the case, a reasonable official would have known that the alleged actions violated the right. *Foulks v. Cole County, Mo.,* 991 F.2d 454 (8th Cir.1993); *Cross v. City of Des Moines,* 965 F.2d 629, 631–32 (8th Cir.1992). *See also Loggins v. Delo,* 999 F.2d 364, 366 (8th Cir. 1993) (first step in qualified immunity analysis was determination of whether conduct violated any clearly established right). The conduct of a reasonable official is measured by what " '[a] reasonably competent official should know.' " *Walters v. Grossheim,* 990 F.2d 381, 384 (8th Cir.1993) (quoting *Slone v. Herman,* 983 F.2d 107, 111 (8th Cir.1993), and denying qualified immunity because a reasonably competent official should know that unless a judgment has been stayed it must be obeyed). Good faith is not an element of the defense, nor relevant to the qualified immunity inquiry, because "the standard is one of 'objective reasonableness.' " *Slone,* 983 F.2d at 110 (quoting *Burk v. Beene,* 948 F.2d 489, 494 (8th Cir. 1991), in turn quoting *Malley v. Briggs,* 475 U.S. 335, 344, 106 S.Ct. 1092, 1097, 89 L.Ed.2d 271 (1986)).[26]

**26.** Before *Harlow,* the subjective good faith of the acting officer was very important in determining the existence of a qualified privilege. *Wood v. Strickland,* 420 U.S. 308, 318, 95 S.Ct. 992, 999, 43 L.Ed.2d 214 (1975). Qualified immunity could not be asserted where malice was shown. *Id.* at 322, 95 S.Ct. at 1000. In the landmark decision *Harlow v. Fitzgerald,* which considered the limits of immunity of presidential aides, the Supreme Court rejected the common law theories and forwarded the "clearly established" standard of liability. 457 U.S. at 815, 102 S.Ct. at 2736. The Court stated that the "malicious intent" test had not prevented insubstantial claims from proceeding to trial. *Id.* at 815–16, 102 S.Ct. at 2736–37. This was because the official's subjective good faith was considered a question of fact which could not be decided by summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. *Id.* On the basis of the discretionary nature of these actions,

an inquiry into the subjective motivation would necessitate extensive discovery and depositions of many parties. *Id.*

Therefore, the Court concluded that mere allegations of malice would no longer be sufficient to subject to liability public officials performing discretionary functions; rather, such officials are generally shielded from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," with that determination made by considering objective factors. *Id.* at 818, 102 S.Ct. at 2738. If the law was clearly established at the time of the alleged violation, the defense of qualified immunity fails, unless the official can show extraordinary circumstances and prove he neither knew nor should have known of the relevant legal standard. *Id.* at 818–19, 102 S.Ct. at 2738–39. An official is expected to know the law governing his conduct. *Id.* However, if the law is not

The Seventh Circuit Court of Appeals has held further that the test of qualified immunity

> is not whether the conduct is clearly constitutional, but whether it is clearly unconstitutional. [Plaintiff's] proposed test would focus on whether courts have specifically sanctioned particular conduct, whereas the correct inquiry is whether courts have found the conduct unconstitutional or have defined a constitutional right in such a way that " 'a reasonable official would understand that what he is doing violates that right.' " *McDonald v. Haskins,* 966 F.2d 292, 293 (7th Cir.1992) (quoting *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law, the unlawfulness must be apparent." *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039 (citations omitted).... Application of this test "does not require a prior case that is 'precisely on all fours on the facts and law.' " *McDonald,* 966 F.2d at 293.... Rather, we are concerned with whether the law was clear "in relation to the specific facts confronting the public official[s] when [they] acted." *Rakovich v. Wade,* 850 F.2d 1180, 1209 (7th Cir.), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988); *see also McDonald,* 966 F.2d at 294.

*Knox v. McGinnis,* 998 F.2d 1405, 1409–10 (7th Cir.1993) (some internal citations omitted); *accord Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039 (it is not necessary that the exact action has been held previously unlawful, but the unlawfulness must be apparent and known from pre-existing law); *Latimore,* 7 F.3d at 712–13 (same).

Finally, the defense of qualified immunity may be utilized successfully

> even in the face of a clearly established (and violated) constitutional right, if the defendant can demonstrate "the 'objective legal reasonableness' of the action assessed in light of the legal rules that were 'clearly

established' at the time it was taken." *Anderson,* 483 U.S. at 639, 107 S.Ct. at 3038 (citations omitted) (quoting *Harlow,* 457 U.S. at 819, 818, 102 S.Ct. at 2739, 2738).

*Latimore,* 7 F.3d at 712.

### 3. The inquiry on a motion for summary judgment

The test for qualified immunity at the summary judgment stage of a proceeding is an objective one: The plaintiff must demonstrate that the law is clearly established and the defendant then bears the burden of showing that his conduct either does not violate plaintiff's rights or that there were extraordinary circumstances such that the defendant neither knew nor should have known of the relevant legal standard. *Johnson-El,* 878 F.2d at 1048; *see also Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738 (on a motion for summary judgment, the court may determine the appropriate and applicable law and whether it was clearly established at the time of the alleged violation). If the plaintiff can show that the defendant's conduct violated clearly established law, "then the defendant, as the movant for summary judgment, must demonstrate that no material issues of fact remain as to whether the defendant's actions were objectively reasonable in light of the law and the information the defendant possessed at the time of his actions." *Cross,* 965 F.2d at 632 (quoting *Salmon v. Schwarz,* 948 F.2d 1131, 1136 (10th Cir.1991)); *Johnson-El,* 878 F.2d at 1048 ("The defendant bears the burden of proof with respect to all other elements of the defense...."). With these standards in mind, the court will consider whether defendants can properly assert qualified immunity to liability in this case.

### B. Qualified Immunity In This Case

The court has determined that defendants violated Sisneros' First Amendment rights when they transferred him back to Arizona in retaliation for exercising his rights to file grievances and lawsuits. However, defendants have raised qualified immunity to any

clearly established, the official could not know his conduct was unlawful and the doctrine does not require the official to anticipate future legal developments. *Id.*

liability for this constitutional violation. Additionally, although the court has determined that the English-only policy does *not* violate Sisneros' rights, the court will nonetheless consider, as an alternative to this holding, whether or not defendants would be entitled to qualified immunity if the English-only rule did violate Sisneros' rights.

### 1. Retaliatory Transfer

In the present case, the court does not believe that there is any doubt that Sisneros has alleged a violation of his constitutional rights as to the retaliatory transfer to Arizona, and that the contours of a prisoner's right to be free from retaliatory transfers are clearly established. When Sisneros was transferred to Arizona on February 5, 1992, the law was clearly established that prison officials could not retaliate against an inmate for the exercise of a constitutional right. Indeed, in *Scher v. Engelke*, 943 F.2d 921 (8th Cir.1991), *cert. denied*, 503 U.S. 952, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992), the Eighth Circuit observed:

> The law making retaliation for the exercise of a constitutional right actionable under § 1983 has been established for some time and an objectively reasonable official could not fail to know of it. *Freeman v. Blair*, 862 F.2d 1330, 1332 (8th Cir.1988) (citing *Mount Healthy City Board of Education v. Doyle*, 429 U.S. 274, 283–84, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977); *Buise v. Hudkins*, 584 F.2d 223, 229 (7th Cir.1978), *cert. denied*, 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979)).

*Scher*, 943 F.2d at 925.

The sole question here, the court believes, is whether defendants knew or should have known that their conduct violated the law. Because the law on retaliatory transfers by prison officials was clearly established at the time of Sisneros' transfer to Arizona, and "a reasonably competent public official should know the law governing his conduct," *Slone*, 983 F.2d at 109 (quoting *Harlow*, 457 U.S. at

819, 102 S.Ct. at 2738), the court concludes that there is no basis upon which these defendants could argue that they did not know and should not have known that their actions violated Sisneros' right to be free from retaliatory transfers. Defendants have not asserted any extraordinary circumstances excusing them from knowing or recognizing that the retaliatory transfer in this case violated Sisneros' rights. Thus, neither defendant is entitled to qualified immunity on the retaliatory transfer claim, and Sisneros is entitled to monetary damages in some amount on this claim in compensation for violation of his rights.

### 2. The English–Only Rule

The court has concluded that defendants did not violate Sisneros' First Amendment rights by imposing on him the English-only rule. However, as an alternative to that holding, the court concludes that even if the English-only rule violated Sisneros' constitutional rights, defendants would be entitled to qualified immunity as to that claim.

Iowa Administrative Code section 291–20.4(1) prohibits the sending or receiving of letters written in a foreign language unless that is the only language of the inmate. Sisneros argues that the right to send and receive correspondence in a language other than English is clearly established. Sisneros has cited only one case in support of this right.[27] This case is *Ramos v. Lamm*, 639 F.2d 559, 581 (10th Cir.1980) *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981), a Tenth Circuit Court of Appeals decision which held a prison policy of refusing to deliver mail written in a language other than English was unconstitutional. The question is whether this single case constitutes "clearly established law."

No Eighth Circuit Court of Appeals or Supreme Court case speaks directly to the issue of whether a single case from another circuit court of appeals is sufficient to show a clearly established law. The Supreme Court

---

**27.** A district court has also held that refusing to deliver mail in a foreign language deprives prisoners of their constitutional rights, but that case is distinguishable in that it allowed no exception for prisoners who did not speak English. *United*

*States ex rel Gabor v. Myers*, 237 F.Supp. 852 (E.D.Pa.1965). Also this case is decided prior to the more recent Supreme Court and Eighth Circuit Court of Appeals rulings on prison mail regulations.

has twice avoided this issue of defining *Harlow's* "clearly established" standard by finding it unnecessary to reach the issue of whether the "state of the law is evaluated by reference to the opinions of this Court, of the Court of Appeals, or the local District Court." *Procunier v. Navarette,* 434 U.S. 555, 565, 98 S.Ct. 855, 857, 55 L.Ed.2d 24 (1978); *Harlow,* 457 U.S. at 818 n. 32, 102 S.Ct. at 2738 n. 32.

The Eighth Circuit Court of Appeals has "in the past taken a broad view of what constitutes 'clearly established law' for the purposes of a qualified immunity inquiry, requiring some but not precise factual correspondence with precedents and demanding that officials apply general, well-developed legal principles." *Boswell v. Sherburne County,* 849 F.2d 1117, 1121 (8th Cir.1988) (citing *Lappe v. Loeffelholz,* 815 F.2d 1173, 1179 (8th Cir.1987)), *cert. denied sub nom. Witschen v. Boswell,* 488 U.S. 1010, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989). It is emphasized that this is a flexible standard, not requiring that the specific action be held unlawful by binding precedent. *J.H.H. v. O'Hara,* 878 F.2d 240, 243 (8th Cir.1989), *cert. denied,* 493 U.S. 1072, 110 S.Ct. 1117, 107 L.Ed.2d 1024 (1990); *Johnson–El v. Schoemehl,* 878 F.2d 1043, 1049 (8th Cir. 1989).

In *Boswell v. Sherburne County,* the Eighth Circuit of Appeals did rely on *Ramos v. Lamm,* but to hold that a pretrial detainee's right to emergency medical care is clearly established. 849 F.2d at 1122. However, this is not the sole basis for the holding. There is a previous Supreme Court case on the issue, as well as an Eighth Circuit Court of Appeals decision. *Id.* at 1121–22. Taken together, the court states, "these are not a few, scattered cases providing first evidence of a right that is just evolving, but rather are

familiar landmarks on the legal terrain." *Id.* at 1122.

In *Johnson–El v. Schoemehl,* 878 F.2d 1043, 1049 (8th Cir.1989), the Eighth Circuit Court of Appeals rejected the defendants' contention that in order for the law to be clearly established, the exact action of the official must be proscribed by a court with direct jurisdiction over the official. The court stated:

> We therefore reject the per se rule advocated by the individual defendants. They argue that for the law to be clearly established, the specific acts of these officials must be particularly proscribed by decisions rendered by this Circuit or another court with direct jurisdiction over the institution. This rule would enable a jail official to claim immunity where several other circuit, district or state courts had condemned similar practices on the basis of the federal Constitution, so long as a Missouri court, or the district court for the Eastern District of Missouri or the Eighth Circuit had not yet done so. While the identity of a court and its geographical proximity may be relevant in determining whether a reasonable official would be aware of the law (as might the dissemination of information within the pertinent profession and the frequency of similar litigation), we do not think that the defendants' per se rule adequately captures what the Supreme Court has meant by its objective test for what is "clearly established." *Harlow v. Fitzgerald,* 457 U.S. at 819, 102 S.Ct. at 2738, *Mitchell v. Forsyth,* 472 U.S. at 535 n. 12, 105 S.Ct. at 2820 n. 12.

*Id.* at 1049 (footnote omitted).[28]

At the time defendants Nix and Hedgepeth applied the English-only regulation to Sisne-

---

28. The other circuits have differed over how a court should determine well-established rights. Several principles, however, can be divined from these decisions. Courts must initially look to whether there have been definitive decisions on the legal issue by either the Supreme Court or the United States Court of Appeals for that particular circuit. *See Olivia D. ex rel. Eugene D. v. Karman,* 889 F.2d 701, 706 (6th Cir.1989); *Poe v. Haydon,* 853 F.2d 418, 424 (6th Cir.1988), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989); *Cagle v. Gilley,* 957 F.2d

1347, 1349 (6th Cir.1992); *Tribble v. Gardner,* 860 F.2d 321, 324 (9th Cir.1988), *cert. denied,* 490 U.S. 1075, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989); *Ward v. County of San Diego,* 791 F.2d 1329, 1332 (9th Cir.1986), *cert. denied sub nom. Duffy v. Ward,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987); *Capoeman v. Reed,* 754 F.2d 1512, 1514–15 (9th Cir.1985); *Medina v. City and County of Denver,* 960 F.2d 1493, 1498 (10th Cir.1992); *see also Melear v. Spears,* 862 F.2d 1177, 1184 n. 8 (5th Cir.1989) (noting that Fifth

ros in 1991, there was no clearly established constitutional principle that the English-only rule in the prison setting was unconstitutional as applied to an inmate similarly situated to Sisneros. Therefore, even if the court had found that the English-only rule violated Sisneros' First Amendment rights, defendants Nix and Hedgepeth would be entitled to qualified immunity as to that claim.

Having determined that Sisneros' right to be free from retaliatory transfers was violated when he was returned to Arizona on February 5, 1992, and that defendants are not entitled to qualified immunity for that violation of Sisneros' constitutional rights, the court may now turn to the question of what relief or remedies are available to Sisneros.

## VII. RELIEF

On July 8, 1994, some time after the court handed down its original April 8, 1994, ruling on the issues of liability and qualified immunity, the court held a hearing on the issue of the proper relief or remedies for the violation of Sisneros' rights. At the hearing, plaintiff Sisneros was represented by Barbara A. Schwartz, Clinical Law Professor at the Iowa College of Law, and two student interns in the University of Iowa College of Law Legal Services Clinic, Linda Kobliska and Michael

Glackin. Defendants were represented by Kristin W. Ensign, Assistant Attorney General, and by a law student intern, Patrick Waldron. Sisneros did not appear personally at the hearing, although his testimony was submitted via deposition. The court also received into evidence the deposition testimony of Mr. Dale Grim, Manager, Special Services, Arizona Department of Corrections. Additionally, the court heard the live testimony of Christopher A. Meek, Division of Institutions, Central Office, Iowa Department of Corrections, and defendant Paul Hedgepeth, and received into evidence various exhibits from the parties.

The issues in this hearing on remedies, and the issues as delineated by the briefs of the parties, focus on two possible forms of relief: (1) injunctive relief, requiring the Iowa Department of Corrections to make some effort to return Sisneros to Iowa; and (2) monetary damages to compensate Sisneros for the violation of his constitutional rights. It is Sisneros' position that the court should craft an injunction requiring defendants to use "all available efforts" to secure his return to Iowa, and that Arizona authorities would be bound by that injunction under *Fed.R.Civ.P.* 65(d), even though they are not parties to this action, if they were given actual notice of the injunction. Sisneros also argues that he is entitled to substantial compensatory dam-

Circuit and Supreme Court decisions "loom largest" in inquiries); *Wallace v. King,* 626 F.2d 1157, 1161 (4th Cir.1980) (noting that law must be authoritatively decided by "the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state...."), *cert. denied,* 451 U.S. 969, 101 S.Ct. 2045, 68 L.Ed.2d 348 (1981). In the absence of decisional law constituting controlling precedent, the courts of appeal have directed that a court should review the decisions of other circuits and district courts on the subject in an attempt to ascertain whether the law is clearly established. *Karman,* 889 F.2d at 706 (noting that court may look to decisions of other circuits in the absence of decisions by that circuit or the Supreme Court); *Capoeman,* 754 F.2d at 1514 (holding that "in the absence of binding precedent, a court should look to whatever decisional law is available to ascertain whether the law is clearly established ..."); *Cagle,* 957 F.2d at 1348 (noting that decisions from other circuits may clearly establish the law); *Medina,* 960 F.2d at 1498 (holding that in the absence of circuit court or Supreme Court decision on point in order for law to be clearly established the weight of authority for "other

courts" must have found the law to be as alleged by plaintiff); *Tribble,* 860 F.2d at 324 (holding that in absence of controlling precedent court should look to " 'all available decisional law including decisions of state courts, other circuits, and district court ...' ") (quoting *Ward,* 791 F.2d at 1332). A single decision from outside the respective circuit, however, has never been found to be sufficient to constitute clearly established law. *Woodward v. City of Worland,* 977 F.2d 1392, 1397 (10th Cir.1992) (holding that one court of appeals decision from outside circuit and several district court opinions failed to demonstrate that law was clearly established), *cert. denied sub nom. Woodard v. Seghetti,* — U.S. ——, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993); *Medina,* 960 F.2d at 1498 (holding that single unpublished district court opinion insufficient to clearly establish the law); *Muhammad v. Wainwright,* 839 F.2d 1422, 1425 (11th Cir.1987) (holding that "a district court opinion, particularly from outside the circuit, cannot, in and of itself, settle the law."). Under this line of authority, Sisneros' citation to the Tenth Circuit's decision in *Ramos,* is insufficient to clearly establish the law in this area.

ages, including non-economic damages, based on the violation of his rights and the difference between the conditions and status of his confinement in Arizona as compared to Iowa.

Defendants argue that there is no on-going violation by Iowa officials that would entitle Sisneros to injunctive relief. Furthermore, they argue that the court cannot order injunctive relief against Arizona officials, because they are not parties to the present litigation. Finally, defendants argue that Sisneros is not entitled to compensatory damages based on differences in conditions and privileges in Arizona as compared to Iowa, because he cannot prove that actions of the defendants were the cause in fact of those differences. Defendants assert that only nominal damages may be awarded for the violation of Sisneros' rights found by the court.

### A. Additional Findings Of Fact

#### 1. Sisneros' transfer and status in Arizona

On February 5, 1992, without any prior notice or warning, Sisneros was told to go back to his cell at the ISP and collect his personal property. His property was collected by guards, and Sisneros was then taken out of the cellblock. Sisneros was strip-searched twice—once by Iowa officials, then by Arizona officials—placed in a leg brace, and taken to the airport by Arizona prison officials. Only as he departed from the ISP was Sisneros informed that he was being transferred back to Arizona. Sisneros testified that he felt embarrassed and humiliated to be seen in restraints in public during his trip to Arizona.

Upon his arrival in Arizona, Sisneros was taken first to the diagnostic center of the Arizona Department of Corrections, which is called Alhambra, for reclassification. Sisneros stayed there in "total lockdown" conditions for sixty-seven days during which time he was out of his cell only one-half to one hour per day, and was unable to work or pursue most exercise or leisure activities he had enjoyed in general population in Iowa. From the Alhambra, Sisneros was taken to the special management unit at the Eyman Complex, a maximum security facility of the Arizona Department of Corrections, where

he stayed for approximately one year. From the Eyman Complex, Sisneros was next taken to a medium security facility called Perryville where he stayed for approximately nine months. Sisneros was then returned to the Eyman Complex where he was placed back in the special management unit, where he remained at the time of his deposition on June 17, 1994.

During both periods at the Eyman Complex and at Perryville, Sisneros was in "locked down" or "isolation" status as the result of his assignment to involuntary protective custody. The reason for Sisneros' assignment to involuntary protective custody was the fear of Arizona officials based on information from confidential informants that Sisneros' life would be at risk were he to enter general population as the result of his former association with the "EME" or "Mexican mafia."

The conditions of Sisneros' incarceration in Arizona since his retaliatory transfer have differed significantly from the conditions he experienced during his stay in Iowa. In Iowa, Sisneros was placed in general population, and was allowed to work at a job for four to six hours per day for five days a week. The actual job assignment was for four hours per day, with any time over that because of "overtime." His job was doing yard maintenance, including sidewalk cleaning, and eventually operating a lawn-mower, for which he was paid, at the time of his transfer, $0.47 per hour. Additionally, Sisneros could participate in sports activities in the ISP "yard," including basketball or volleyball, or use of weights, stairclimbers, or other exercise equipment. Sisneros was involved in team sports while at Iowa. Sisneros was able to use shower facilities after work or after sports activities. Sisneros also had regular access to the library and law library, including access to typewriters and paper, and participated in rehabilitative programs including anger management, AA, and drug abuse counseling. Sisneros testified that apart from "cell counts," he was outside of his cell from about 7:00 a.m. until about 5:00 or 5:30 p.m. each day. He ate meals in the communal dining hall, and had access to telephones during recreation periods. Sisne-

ros was able to have a color TV and cassette tape player in his cell. Sisneros also testified that he believed his medical care during his stay in Iowa had been satisfactory.

By contrast, during the whole of his incarceration in Arizona since his transfer, Sisneros has been in isolation pending reclassification, or in involuntary protective custody. Sisneros has not been allowed out of his cell for more than one-half to one hour per day for limited exercise or hygiene purposes. At the time of his deposition, Sisneros was allowed to have a TV and a stereo, an item not allowed at the ISP. However, he is not allowed to perform any work in his current status, and therefore has no income. Sisneros is not allowed to take communal meals, nor to participate in any team sports. Sisneros also testified to his belief that his medical care in Arizona has not been adequate. Although Sisneros is allowed access to the library three times a week, he testified that trips to the library were largely "pointless," because of the uncooperativeness of the general population inmates there, who are responsible for obtaining materials for patrons, towards inmates in protective custody status. It appears from Sisneros' testimony that he also has less access to hobbycraft activities than he had in Iowa. The record does demonstrate that Sisneros has had visits from family members since his return to Arizona, although he had no such visits while in Iowa, but that he does not have as ready access to telephones.

Sisneros has made some attempts to be reclassified out of involuntary protective custody since his return to Arizona, but each has been denied. Sisneros sought reclassification in March of 1993, leading to a reclassification hearing on May 26, 1993. Following the hearing, Sisneros' request for reclassification was denied. Between March and September of 1992, Sisneros had three minor "write-ups" for rules violations. In October of 1992 a "shank" or hand-made knife was found in the ceiling between his cell and that of another inmate, but evidence that the "shank" belonged to Sisneros was sufficiently inconclusive that no disciplinary action was taken against him. However, in light of this record, and renewed information from confiden-

tial informants that Sisneros' life was at risk or that Sisneros might himself be a "hitman" with targets within the prison, Arizona prison officials refused to change Sisneros' classification from involuntary protective custody, and have consistently refused to make that change since May of 1993. The court finds that the decision of the Arizona prison officials in May of 1993 not to reclassify Sisneros out of involuntary protective custody was an independent, intervening cause of Sisneros' continued incarceration in that status cutting off defendants' responsibility for Sisneros' continuing in that status.

### 2. Transfers under the Interstate Corrections Compact

Transfers under the Interstate Corrections Compact are initiated by the sending state, which bears the costs of transporting the inmate to and from the receiving state. Acceptance of transfers is entirely within the discretion of the receiving state. According to the testimony of Dale Grim, Arizona has continued its attempts to transfer Sisneros outside of Arizona since his return from Iowa. However, Texas refused to accept Sisneros as a transfer inmate. Mr. Grim declined to testify, on advice of counsel, as to the details of any other attempts to transfer Sisneros that might be underway at the time of his deposition.

Both Mr. Grim and defendant Hedgepeth testified that prospective receiving states receive a packet of information from the sending state concerning the prospective transfer inmate. That packet generally includes copies of commitment documents, presentence investigation reports, specific medical and psychological reports, and disciplinary records. Inmates are considered for transfer on the basis of benevolent concerns, such as transfer of an inmate to be closer to family, friends, or other connections, on the basis of management problems, such a frequent disciplinary problems, and for purposes of protecting the inmate. States considering receiving a transfer inmate consider a number of factors, including whether they can trade a similar inmate, whether they can handle the inmate's problems, and whether the inmate will adjust to the receiving state. Both Mr.

Grim and defendant Hedgepeth testified that a record of assaultive behavior on the part of the inmate would be a principal concern, while neither witness believed that litigious conduct would be of any particular significance.

Mr. Grim testified that Arizona would consider overtures from Iowa for the return of Sisneros, but that any return would have to be at Iowa's expense. Additionally, both Mr. Grim and defendant Hedgepeth testified to their belief that efforts by this court to require Iowa to attempt to secure Sisneros' return would have a negative impact on operations of the Interstate Corrections Compact, because the potential for such court intervention might make the Compact appear to be more difficult to operate than its benefits would merit. The court finds this testimony concerning the effects on operation of the Interstate Correction Compact of ordering efforts by Iowa officials to secure Sisneros' return to Iowa to be highly speculative.

### B. Damages

"In Section 1983 cases, prisoners may receive remedies comparable to all civil litigants." *Williams v. Lane,* 851 F.2d 867, 885 (7th Cir.1988); *Nichols v. Nix,* 810 F.Supp. 1448, 1467 (S.D.Iowa 1993). The Supreme Court has repeatedly observed that 42 U.S.C. § 1983 was intended to create " 'a species of tort liability' in favor of persons who are deprived of 'rights, privileges, or immunities secured' to them by the Constitution." *Memphis Community Sch. Dist. v. Stachura,* 477 U.S. 299, 305–06, 106 S.Ct. 2537, 2541–43, 91 L.Ed.2d 249 (1986) (quoting *Carey v. Piphus,* 435 U.S. 247, 253, 98 S.Ct. 1042, 1046, 55 L.Ed.2d 252 (1978), in turn quoting *Imbler v. Pachtman,* 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976)); *see also Smith v. Wade,* 461 U.S. 30, 34, 103 S.Ct. 1625, 1628, 75 L.Ed.2d 632 (1983); *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 258–59, 101 S.Ct. 2748, 2755–56, 69 L.Ed.2d 616 (1981). Thus, when a § 1983 plaintiff "seeks damages for violations of con-

stitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." *Stachura,* 477 U.S. at 306, 106 S.Ct. at 2542.

"Generally, compensatory damages should attempt to place a plaintiff in a position similar to the one she or he would have been in had the violation not occurred." *Cunningham v. City of Overland, Mo.,* 804 F.2d 1066, 1069 (8th Cir.1986). However, in order for a § 1983 plaintiff to obtain compensatory damages for a constitutional violation, the plaintiff must prove those damages. *Butler v. Dowd,* 979 F.2d 661, 671 (8th Cir. 1992) (citing *Carey,* 435 U.S. at 263, 98 S.Ct. at 1052), *cert. denied,* — U.S. —, 113 S.Ct. 2395, 124 L.Ed.2d 297 (1993). Therefore, only a § 1983 plaintiff who can prove actual injury caused by a constitutional violation is entitled to compensatory damages. *Carey,* 435 U.S. at 264, 98 S.Ct. at 1052; *Stevens v. McHan,* 3 F.3d 1204, 1207 (8th Cir.1993); *Cummings v. Malone,* 995 F.2d 817, 822 (8th Cir.1993); *Cowans v. Wyrick,* 862 F.2d 697, 700 (8th Cir.1988); *Howard v. Adkison,* 887 F.2d 134, 139 (8th Cir.1989) (jury instructions taken as a whole properly articulated requirement that damages could be awarded in an amount that would fairly compensate plaintiff for injury caused by constitutional violation); *Webb v. Arresting Officers,* 749 F.2d 500, 501 (8th Cir.1984) ("The purpose of a damage award in § 1983 actions is to compensate the person harmed for the injuries sustained because of the deprivation of his constitutional rights," citing *Carey,* 435 U.S. at 254, 257, 98 S.Ct. at 1047, 1048).[29] Even where the actual trial testimony contained no formal evidence of actual damage, an award of damages may be proper, because harm "can be inferred from the circumstances as well as established by the testimony." *Howard,* 887 F.2d at 139 (quoting *Seaton v. Sky Realty Co., Inc.,* 491 F.2d 634, 635 (7th Cir.1974), which discussed damages for humiliation). An actual injury

---

**29.** The rule that damages can only be awarded for actual injury "caused by" or "because of" the constitutional violation is, in this court's view, related to the rule that "[s]ection 1983, of course, requires a causal relationship between a defendant's conduct and a plaintiff's constitutional deprivation. Absent such a relationship, the defendant is entitled to dismissal." *Latimore v. Widseth,* 7 F.3d 709, 715 (8th Cir.1993) (*en banc*), *cert. denied,* — U.S. —, 114 S.Ct. 1124, 127 L.Ed.2d 433 (1994).

caused by constitutional violations is compensable even if the injury is not of great significance. *Howard v. Barnett,* 21 F.3d 868, 873 (8th Cir.1994) (Eighth Amendment excessive force violation causing slight injury justified at least nominal damages award). The Eighth Circuit Court of Appeals has found injuries including loss of prison job, detention, and loss of privileges constitute actual injuries if they result from a constitutional violation, and hence are compensable with damages. *Moran v. Farrier,* 924 F.2d 134, 137–38 (8th Cir.1991) ($250 damages for these injuries caused by due process violation). Compensable injuries in a § 1983 case also include mental and emotional distress caused by the constitutional violation. *Carey,* 435 U.S. at 264, 98 S.Ct. at 1052; *Stevens v. McHan,* 3 F.3d at 1207; *Burgin v. Iowa Dep't of Corrections,* 923 F.2d 637, 639 (8th Cir.1991) (upholding award of $1,250.00 for pain, suffering, and humiliation). Although even slight injuries are compensable, the factfinder may properly withhold damages where there is insufficient proof of those damages. *Johnson v. Bowers,* 884 F.2d 1053, 1056 (8th Cir.1989). Furthermore, damages may not be awarded to compensate for the abstract value or importance of the constitutional right violated. *Stachura,* 477 U.S. at 312–13, 106 S.Ct. at 2546; *Vosburg v. Solem,* 845 F.2d 763, 767 (8th Cir.1988), *cert. denied,* 488 U.S. 928, 109 S.Ct. 313, 102 L.Ed.2d 332 (1988).

■ Nominal damages may be awarded to a prevailing § 1983 plaintiff if the injuries resulting from the constitutional violation have no monetary value or are insufficient to justify with reasonable certainty a more substantial measure of damages. *Id.* (citing *Cowans,* 862 F.2d at 700); *Cummings,* 995 F.2d at 823; *Butler,* 979 F.2d at 672; *Warren v. Fanning,* 950 F.2d 1370 (8th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 111, 121 L.Ed.2d 68 (1992). Thus, an award of nominal damages for a constitutional violation is not inadequate as a matter of law. *Butler,* 979 F.2d at 673. However, an unexplained award of damages, or reduction of those damages by the court after a jury verdict, is an abuse of discretion. *Thongvanh,* 17 F.3d at 260.

Courts of this circuit have been willing to award per diem damages for constitutional violations, as long as those awards were not arbitrary and excessive. *See, e.g., Stevens,* 3 F.3d at 1207 (per diem award for days in unconstitutional administrative segregation was allowable, but $500 per day was excessive); *Maxwell v. Mason,* 668 F.2d 361, 366 (8th Cir.1981) ($100 per day for solitary confinement); *Bressman v. Farrier,* 825 F.Supp. 231, 238 (N.D.Iowa 1993) (awarding $40 per day for each day served in solitary confinement in violation of plaintiff's constitutional rights); *Charron v. Medium Security Institution,* 730 F.Supp. 987, 998 (E.D.Mo.1989) (awarding $100 per day for six days of improper segregation, even though the court concluded that there was no actual harm as the result of placement in segregated status); *see also Langley v. Coughlin,* 715 F.Supp. 522, 558 (S.D.N.Y.1989) (citing cases for the proposition that "courts have been perfectly willing, based simply on proof of objective conditions in a prison, to award *per diem* damages to an inmate unconstitutionally confined," and discussing ways in which *per diem* damages could be calculated). However, while expressing no criticism of *per diem* awards, the court concludes that in the circumstances of this case, a lump sum award intended to encompass all of the kinds of damages to which Sisneros is entitled is preferable to parsing out those damages on a daily basis. Furthermore, Sisneros has been incarcerated in three different institutions since his return to Arizona, each with slightly different protective custody conditions making a *per diem* award unnecessarily complicated in its calculation. Notwithstanding that conclusion, Sisneros' lost wages from prison employment may be calculated on a per day basis, because the court should endeavor to award compensatory damages "to place [Sisneros] in a position similar to the one ... he would have been in had the violation not occurred." *City of Overland,* 804 F.2d at 1069.

■ Unlike compensatory damages, "[t]he purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Stachura,* 477 U.S. at 306 n. 9,

106 S.Ct. at 2543 n. 9. *Cf. Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (explicitly holding that a jury may assess punitive damages if a "defendant's conduct ... involves reckless or callous indifference to the federally protected rights of others"); *Wright v. Jones,* 907 F.2d 848, 852 (8th Cir.1990) (quoting *Smith,* and concluding that *Stachura's* "willful or malicious conduct" language was dicta, and was not intended to modify the explicit holding of *Smith* ).

■ The district court's award of damages in a § 1983 case is reviewed for abuse of discretion, and will be remanded for recalculation if it is arbitrary and excessive. *Stevens,* 3 F.3d at 1207 (citing *Maxwell v. Mason,* 668 F.2d 361, 366 (8th Cir.1981)).

■ The court concludes that Sisneros' has shown actual injuries caused by the constitutional violation in this case. Defendants argue strenuously that they did not cause Sisneros' injury, in the form of lesser privileges in the Arizona prison system, because they have no control over conditions in that prison system. However, it is plain that Sisneros lost privileges as the result of the retaliatory transfer in violation of his constitutional rights, because it was that transfer that caused Sisneros to be subjected to more restrictive conditions. Sisneros' position is the same as that of a prisoner subjected to less favorable conditions in disciplinary detention as compared to general population where his change in status is caused by a due process violation. The injury is caused by the constitutional violation that changes the prisoner's status, not by the conditions to which he is subjected, which may in no way violate the Constitution. Furthermore, it was certainly foreseeable to these defendants that Sisneros would be returned to the restrictive conditions of involuntary protective custody upon return to Arizona. Those were the conditions in which Sisneros had been confined while in Arizona, and the purpose of his transfer was at least in part, if not primarily, to allow him access to general population privileges commensurate with his security rating, because it was impossible to pro-

vide such access in Arizona in the face of a real and serious threat to Sisneros' life.

■ However, the court is also persuaded that the constitutional violation found here did not cause Sisneros' injuries that result from another, intervening cause. The court finds that although defendants' retaliatory transfer caused Sisneros to be subjected to the much more restrictive conditions of involuntary protective custody in Arizona, they did not cause his continued assignment to that status once Arizona officials made a determination based on new information or circumstances that Sisneros could not be returned to general population despite his requests. Thus, on May 26, 1993, when Arizona officials denied Sisneros' request for reclassification out of involuntary protective custody on the basis that new confidential information identified him both as a possible target of violence and a possible "hitman," Sisneros' assignment to his restrictive status was "caused by" the decision of Arizona officials, and not by a constitutional violation by the defendants here. The court concludes that Sisneros' damages caused by the constitutional violation terminated with that decision of the Arizona officials. Furthermore, the court finds that there is a failure of proof of any future damages, because Sisneros' assignment to any particular status within an Arizona prison is subject to the broad discretion of Arizona prison officials.

■ The court finds that Sisneros is entitled to damages for his lost wages from February 5, 1992, until May 26, 1993. Sisneros shall therefore be awarded $639.20 as compensation for the loss of wages for four hours per day at $0.47 per hour for 4 hours per day, five days a week, for 68 weeks.[30] The court turns next to determination of a lump sum damage award to compensate Sisneros for a variety of other injuries resulting from his retaliatory transfer. The court places little weight in its calculation of further damages on Sisneros' testimony that he was humiliated either by the strip searches to which he was subjected or by his appearing in restraints in public, as these circumstances were incident to his status as a pris-

---

30. The court awards damages only for the regularly scheduled hours Sisneros was working, be-

cause "overtime" in this case appears to be entirely speculative.

oner generally, rather than specifically because of the constitutional violation found here. However, the court finds that Sisneros did suffer mental or emotional distress as the result of a transfer back to highly restrictive conditions from comparatively unrestricted conditions caused by the unconstitutional retaliatory transfer. The court finds further injuries caused by the retaliatory transfer to be loss of out-of-cell time, loss of access to the yard and its exercise facilities, and loss of access to communal activities including meals and sports. The court concludes that the sum of $5000 will adequately compensate Sisneros for these non-economic injuries caused by the retaliatory transfer, and awards this sum as damages for Sisneros' actual injuries apart from lost wages.[31]

■ Sisneros is therefore awarded compensatory damages in the amount of $5,639.20 against defendants, jointly and severally. The court also considers this an appropriate case for the award of punitive damages. The court finds that the complete lack

of a mixed motive for the retaliatory transfer, or even the hint of a legitimate reason for the transfer, are indicative of the willfulness and maliciousness of the defendants in ordering that transfer. Again, the record reveals that the only reason for Sisneros' transfer was that the defendants objected to his use of the grievance procedures and filing of lawsuits, both of which are plainly protected activities. Defendants transferred Sisneros as a willful and malicious response to his engaging in these protected activities. The court therefore orders an award of $1000 in punitive damages against each defendant as a sufficient amount to underline the willfulness and maliciousness of their conduct in this case.[32]

The court turns next to the question of whether it can order prospective relief in the form of an injunction to remedy the unconstitutional transfer.

### C. Injunctive Relief

In addition to money damages, Sisneros seeks injunctive relief requiring defendants

---

31. Were the court to consider this award as an award of *per diem* damages, the court finds that it would amount to approximately $10.50 per day. Such an amount as a *per diem* award seems to this court to be appropriate in comparison to the *per diem* amounts awarded by other courts for placement in even more restrictive conditions for unconstitutional reasons, and in recognition of the fact that Sisneros was incarcerated in three different institutions during the period involved, each of which may have had slightly different conditions.

32. Having prevailed on his retaliatory transfer claim, Sisneros is a prevailing party within the meaning of the Civil Rights Attorney Fee Award Act of 1976, 42 U.S.C. § 1988. *See generally Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 793, 109 S.Ct. 1486, 1494, 103 L.Ed.2d 866 (1989) ("They prevailed on a significant issue in the litigation and have obtained some of the relief they sought and are thus 'prevailing parties' within the meaning of § 1988."); *Farrar v. Hobby*, ── U.S. ──, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) ("[T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim..:. In short, a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff."). Indeed, it is clear that statutory attorney fees awarded under 42 U.S.C. § 1988 are part of the "arsenal of remedies to combat violations of civil rights."

*Evans v. Jeff D.*, 475 U.S. 717, 732, 106 S.Ct. 1531, 1540, 89 L.Ed.2d 747 (1986).

As a prevailing party, Sisneros is reminded of the following provisions concerning recovery of attorney fees. N.D.Ia. LR 22 governs claims for attorney's fees and expenses in this district. That rule states, in pertinent part, that

[a]ll post-judgment motions for an award of attorney fees shall be filed within the time required by *Fed.R.Civ.P.* 54(d)(2)(B). The claimed amount shall be supported by adequate itemization, including the amount of time claimed for any specific task as well as the hourly rate claimed. Expenses shall be separately itemized. The itemization shall also include a separate summary indicating how much total time was expended on each major category of work performed such as drafting pleadings, motions and briefs; legal research; investigation; interviewing; trial preparation and trial.

N.D.Ia. LR 22(1). The time requirement incorporated in the local rule from *Fed.R.Civ.P.* 54(d)(2)(B) is that "[u]nless otherwise provided by statute or order of the court, the motion must be filed and served no later than 14 days after entry of judgment." Furthermore, the federal rule provides, in pertinent part, that the motion must specify the judgment and the statute, rule, or other grounds entitling the moving party to the award; and must state the amount or provide a fair estimate of the amount sought.

*Fed.R.Civ.P.* 54(d)(2)(B).

to take some action to secure his return to Iowa. This request requires the court to address two questions: first, is this an appropriate § 1983 case for injunctive relief to be granted, and, second, can the court craft appropriate injunctive relief to remedy Sisneros' wrongs?

### 1. Appropriateness of injunctive relief

"A federal court possesses broad powers to remedy constitutional violations, but these powers are not boundless." *Al–Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir.1991). The parties both argue that the propriety of an injunction in this case should be determined according to the factors identified in the Eighth Circuit Court of Appeals' decision in *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 & n. 5 (8th Cir.1981) (*en banc*).[33] These factors, they argue, must be considered as far as they pertain to the issuance of an injunction based upon a finding of a constitutional violation rather than as they pertain to maintaining the status quo prior to litigation on the merits. The court has some reservations about the applicability of the *Dataphase* factors to the determination of whether or not a *permanent* injunction should issue after a finding of a constitutional violation, because the purpose of the *Dataphase* inquiry is to weigh the equities before issuing a preliminary injunction to maintain the status quo.[34] However, courts of this circuit have consistently held that the factors considered for issuance of a permanent injunction are the same as those for a preliminary injunction, with the exception

that the court determines actual success on the merits. *See, e.g., Allen v. State of Minnesota,* 867 F.Supp. 853, 858 (D.Minn. 1994); *Current–Jacks Fork Canoe Rental Ass'n v. Clark,* 603 F.Supp. 421, 424 (E.D.Mo.1985). The court finds that application of the *Dataphase* factors in this case makes issuance of a permanent injunction appropriate.

■■■ The court has already found actual harm and Sisneros has prevailed on the merits. "The loss of First Amendment freedoms for even minimal periods of time unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976). Sisneros was deprived of those rights by the retaliatory transfer in this case. Furthermore, the balance of harms weighs in favor of granting an injunction here, because Sisneros was injured by the retaliatory transfer, but only the burdens of remedying that injury, and no real harm, will accrue to defendants if the court enjoins them to take corrective action.

Defendants assert that the public interest will be harmed, in the form of a negative impact on operation of the Interstate Corrections Compact, if the court orders defendants to attempt to secure Sisneros' return. The court finds this argument unpersuasive if not disingenuous. If the court orders defendants to attempt to rectify a wrongful, retaliatory transfer, it is not interfering in the operations of the Interstate Corrections Compact; it is requiring the defendants, and only the defendants, to live up to their constitutional

**33.** The most recent formulation of the *Dataphase* standards is as follows:

> When considering a motion for a preliminary injunction, a district court weighs the movant's probability of success on the merits, the threat of irreparable harm to the movant absent the injunction, the balance between the harm and the injury that the injunction's issuance would inflict on other interested parties, and the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 114 (8th Cir.1981) (*en banc*). We reverse the issuance of a preliminary injunction only if the issuance "is the product of an abuse of discretion or misplaced reliance on an erroneous legal premise." *City of Timber Lake v. Cheyenne River Sioux Tribe,* 10 F.3d 554, 556 (8th Cir.1993), *cert. de-*

*nied,* —— U.S. ——, 114 S.Ct. 2741, 129 L.Ed.2d 861 (1994).
*Pottgen v. Missouri State High Sch. Activities Ass'n,* 40 F.3d 926, 929 (8th Cir.1994).

**34.** The Eighth Circuit Court of Appeals has recognized that the purpose of issuing a *preliminary* injunction in a lawsuit is to preserve the status quo and to prevent irreparable harm until the court has an opportunity to rule on the lawsuit's merits. *Devose v. Herrington,* 42 F.3d 470, 471 (8th Cir.1994) (*per curiam*) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 113 & n. 5 (8th Cir.1981) (*en banc*)); *Sanborn Mfg. v. Campbell Hausfeld/Scott Fetzer Co.,* 997 F.2d 484, 490 (8th Cir.1993); *Rathmann Group v. Tanenbaum,* 889 F.2d 787, 789–90 (8th Cir.1989); *Ferry–Morse Seed Co. v. Food Corn, Inc.,* 729 F.2d 589, 593 (8th Cir.1984).

obligations. The provisions of the Interstate Corrections Compact, which permit a receiving state to return an inmate for any reason or no reason, certainly do not permit a receiving state to return an inmate for unconstitutional reasons. Thus, nothing about ordering defendants to seek Sisneros' return even impinges on operation of the Interstate Corrections Compact. Parties operating under that compact have nothing to fear from courts so long as their conduct accords with constitutional principles, and that standard applies to conduct of every aspect of prison administration. The court finds further that the public interest is best served by vindication of constitutional rights. Therefore, the court finds that issuance of an injunction requiring defendants to seek Sisneros' return to Iowa is appropriate under the *Dataphase* factors.

 The court will also look to the standards for determining whether or not to issue a permanent injunction that are specifically applied to the issuance of an injunction in § 1983 cases.

The Eighth Circuit Court of Appeals recently stated the standards for issuance of an injunction in a § 1983 action:

An injunction must be tailored to remedy the specific harm shown.... Furthermore, title 42 U.S.C. § 1983, the title under which this action was brought, requires *inter alia* that, in order for liability to ensue, a person must be subjected to a deprivation of ... rights ... secured by the constitution and laws....

*Falls v. Nesbitt,* 966 F.2d 375, 380 (8th Cir. 1992) (quoting *Rogers v. Scurr,* 676 F.2d 1211, 1214 (8th Cir.1982)); *Johnson v. Boreani,* 946 F.2d 67, 72 (8th Cir.1991); *accord Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971) (a federal court may exercise its remedial power "only on the basis of a constitutional violation."). Where there is no constitutional violation, there is no necessity for injunctive relief. *Falls,* 966 F.2d at 380. Furthermore, a prisoner's claim for injunctive relief is moot if the prisoner is no longer subject to the conditions of which he complained. *Martin v. Sargent,* 780 F.2d 1334, 1337 (8th Cir.1985). The petitioner

must prove that the violation is ongoing in nature or likely to recur. *See Green v. Mansour,* 474 U.S. 64, 71, 106 S.Ct. 423, 427, 88 L.Ed.2d 371 (1985); *Johnson,* 946 F.2d at 72. The Eighth Circuit Court of Appeals has stated this part of the standard as follows:

A showing that unconstitutional practices have taken place in the past is not enough. [The plaintiff] must show that such practices are likely to affect him in the future. *See [Sterling v. Calvin,* 874 F.2d 571, 572 (8th Cir.1989) ].

*Butler v. Dowd,* 979 F.2d 661, 674 (8th Cir. 1992).

Defendants argue that Sisneros is no longer subject to the conditions of which he complained, because his transfer has been completed and the unconstitutional conduct of the defendants towards him is unlikely to be repeated. However, the court's determination that defendants' liability for damages terminated when Arizona prison officials independently determined that Sisneros could not be relieved of the restrictive conditions of involuntary protective custody, was not a conclusion that Sisneros was not suffering an on-going constitutional violation. Sisneros remains in Arizona where he would not be but for the unconstitutional conduct of defendants. The court concludes that it has the power and duty to attempt to remedy that constitutional violation.

### 2. Shaping injunctive relief in this case

If the petitioner successfully establishes a constitutional violation, the "nature and extent of the constitutional violation determines the remedy." *Milliken v. Bradley,* 418 U.S. 717, 744, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069 (1974) (citing *Swann,* 402 U.S. at 16, 91 S.Ct. at 1276). In shaping equitable relief, "the trial court is vested with broad discretionary power.... Moreover, in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable." *Lemon v. Kurtzman,* 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973) (footnote omitted). "While the remedy must be narrowly tailored," the court retains the discretion to construct its remedial decree. *United States*

*v. Paradise,* 480 U.S. 149, 184, 107 S.Ct. 1053, 1073, 94 L.Ed.2d 203 (1987). An injunction must be narrowly tailored to avoid conflict with the caveat that the entry of unnecessary or overbroad injunctions would " 'leave too little discretion in the hands of prison officials who must deal with the very difficult issues of security within their institutions.' " *Johnson,* 946 F.2d at 72 (quoting *Rogers v. Scurr,* 676 F.2d 1211, 1214 (8th Cir.1982)); *see also Butler,* 979 F.2d at 674 ("Injunctive relief . . . must be carefully tailored to remedy the alleged specific harm to the parties involved.").

Defendants argue that the court is powerless to enter an injunction requiring Arizona officials to do anything to facilitate Sisneros' return. Thus, they argue that any injunctive relief the court could order would go beyond the narrow limits of *Fed.R.Civ.P.* 65(d) authorizing injunctions to reach certain nonparties to the litigation from which the injunction flows. The court concludes that this argument is also flawed.

■ *Fed.R.Civ.P.* 65(d) provides for the form and scope of injunctive relief as follows:

> Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

In *Regal Knitwear Co. v. NLRB,* 324 U.S. 9, 65 S.Ct. 478, 89 L.Ed. 661 (1945), the Supreme Court commented that Rule 65(d) should not be construed to allow courts to issue injunctions which are "so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law." *Regal Knitwear,* 324 U.S. at 13, 65 S.Ct. at 481. Furthermore, the limitations on the federal courts in this area was described by Judge Learned Hand as follows:

> [A court] cannot lawfully enjoin the world at large, no matter how broadly it words its decree. If it assumes to do so, the decree is *pro tanto brutum fulmen,* and the persons enjoined are free to ignore it. It is not vested with sovereign powers to declare conduct unlawful; its jurisdiction is limited to those over whom it gets personal service, and who therefore can have their day in court. Thus, the only occasion when a person not a party may be punished, is when he has helped to bring about, not merely what the decree has forbidden, because it may have gone too far, but what it has the power to forbid, an act of a party. This means that the respondent must either abet the defendant, or must be legally identified with him.

*Alemite Mfg. Corp. v. Staff,* 42 F.2d 832, 832–33 (2d Cir.1930). However, under *Fed.R.Civ.P.* 65(d), it is entirely permissible for non-parties to be enjoined when a court finds the non-party is acting in concert or participation with the named party. *Fed.R.Civ.P.* 65(d); *see also I.C.C. v. Holmes Transp., Inc.,* 983 F.2d 1122, 1126 (1st Cir.1993) (" '[t]o hold a nonparty bound by an injunction it is thus essential to prove either that the nonparty participated in the contumacious act of a party or that the nonparty was subject to the injunction because legally identified as a party,' " quoting *G. & C. Merriam Co. v. Webster Dictionary Co., Inc.,* 639 F.2d 29, 35 (1st Cir.1980)); *Supporters to Oppose Pollution, Inc. v. Heritage Group,* 973 F.2d 1320, 1328 (7th Cir.1992) ("a federal injunction constrains the named parties, plus others to the extent specified in *Fed.R.Civ.P.* 65(d)").

■ However, federal courts have an inherent authority to enforce their injunctions. *Parker v. Ryan,* 960 F.2d 543, 546 (5th Cir. 1992); *Waffenschmidt v. MacKay,* 763 F.2d 711, 716 (5th Cir.1985), *cert. denied,* 474 U.S. 1056, 106 S.Ct. 794, 88 L.Ed.2d 771 (1986); *Pasco Int'l (London) Ltd. v. Stenograph Corp.,* 637 F.2d 496, 501 (7th Cir.1980) (nonparties are potentially subject to contempt for any violations of an injunction of which they have actual notice). An injunction "not only binds the . . . defendant but also those identified with [the defendant] in interest, in "privity" with [the defendant], represented

by [the defendant] or subject to [the defendant's] control." *Parker,* 960 F.2d at 546 (quoting *Waffenschmidt,* 763 F.2d at 717, in turn quoting *Regal Knitwear,* 324 U.S. at 14, 65 S.Ct. at 481). Thus, the federal court has jurisdiction over a non-party to enforce the court's injunction if (1) the non-party knew about the injunction against the defendant, and (2) acted as the defendant's agent or aided and abetted the defendant for the purpose of advancing his interest. *Parker,* 960 F.2d at 546; *United States v. Paccione,* 964 F.2d 1269, 1274 (2d Cir.1992); *Pasco Int'l (London) Ltd. v. Stenograph Corp.,* 637 F.2d 496, 501 (7th Cir.1980) (non-parties are potentially subject to contempt for any violations of an injunction of which they have actual notice). To put it another way,

> "We agree that a person who knowingly assists a defendant in violating an injunction subjects himself to civil as well as criminal proceedings for contempt. This is well established law." *Alemite Mfg. Corp.,* 42 F.2d] at 832. A court may bind non-parties to the terms of an injunction or restraining order to preserve its ability to render a judgment in a case over which it has jurisdiction. *See Vuitton et Fils S.A. v. Carousel Handbags,* 592 F.2d 126, 129 n. 6 (2d Cir.1979).

*Paccione,* 964 F.2d at 1274–75. Contempt is "willful disobedience to clear and unambiguous orders of the court." *Id.* (quoting *In re Weiss,* 703 F.2d 653, 660 (2d Cir.1983)).

▪ The court's power to enforce its injunction against non-parties under *Fed. R.Civ.P.* 65(d) extends to those who act "in active concert or participation" with defendants even though the non-parties "were independently motivated." *New York State Nat'l Organization for Women v. Terry,* 961 F.2d 390, 397 (2d Cir.1992), *vacated on other grounds,* ── U.S. ──, 113 S.Ct. 1233, 122 L.Ed.2d 640 (1993). But, a non-party, even one with notice of the injunction, " 'cannot be held in contempt until shown to be in concert or participation' with defendant." *Spindelfabrik Suessen–Schurr v. Schubert & Salzer,* 903 F.2d 1568, 1580 (Fed.Cir.1990) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 112, 89 S.Ct. 1562, 1570, 23 L.Ed.2d 129 (1969)). Furthermore, a non-party who does not act "in concert or participation" with the defendant cannot be held in contempt for any future violations of an injunction by the defendant. *Id.* at 1581. Sisneros correctly points out that federal courts have routinely relied on Rule 65(d) in civil rights cases to sanction non-parties for violation of an injunction. *See, e.g., Roe v. Operation Rescue,* 919 F.2d 857, 872 (3d Cir.1990) (non-party found in contempt for knowingly violating TRO enjoining parties from interfering with abortion clinic activities); *United States v. Hall,* 472 F.2d 261 (5th Cir.1972) (non-parties sanctioned for interference with school desegregation order).

▪ The court concludes that defendants' argument concerning the court's power to reach conduct of Arizona officials rather anticipates matters. The court is not concerned here with prejudging whether Arizona officials are or might be non-parties who act in concert or participation with these Iowa defendants in thwarting any injunction the court might issue. When and if it can be shown that Arizona officials have notice of any injunction issued in this case, and have acted in such a way as to thwart that injunction, the court may be asked to consider whether the Arizona officials acted in concert or participation with the Iowa defendants to whom the injunction would specifically apply. If they are found to have acted in such a manner, the court will have the power to impose penalties in the form of contempt of court sanctions upon them. However, the court's only concern at the moment is to fashion an injunction against the present defendants that will remedy their unconstitutional conduct towards Sisneros. The court can and will fashion such an injunction.

The injunction that is appropriate in the circumstances of this case should require defendants to use all available efforts to secure Sisneros' return to Iowa, bear or arrange for payment of all expenses relating to his return, and report to the court on a regular basis concerning all efforts defendants have undertaken to secure his return. The injunction should also require the defendants to provide notice of this injunction to any and all Arizona officials or other interested non-parties involved in any way in defendants'

attempts to secure Sisneros' return to ISP by providing such persons with copies of this order. This notice requirement is to insure that the conduct of any non-party involved in the process to return Sisneros to Iowa be with notice of this court's injunction.

### 3. The permanent injunction

With due consideration for the standards governing the scope and purpose of an injunction articulated in *Fed.R.Civ.P.* 65(d) and the cases discussed above, and for the reasons articulated in this opinion, **THE COURT ORDERS THAT DEFENDANTS BE AND HEREBY ARE ENJOINED AS FOLLOWS:**

(1) Defendants, their officers, agents, servants, employees, and attorneys, shall exercise all available efforts to secure Sisneros' return to ISP. These efforts shall be without regard to Sisneros' past conduct of protected activities and shall further be made in good faith.

(2) Defendants shall bear or arrange for payment of all expenses for Sisneros' return to Iowa, so that neither the State of Arizona, its officials, Sisneros, nor anyone associated with Sisneros shall be required to bear any of those expenses.

(3) Defendants shall report to the court every thirty days, beginning thirty days from the date of this order, on the precise steps they have taken to secure Sisneros' return and what, if any, result those efforts have produced, and what, if any, impediments appear to thwart their efforts. The report shall contain, at a minimum, copies of all correspondence sent or received and notes or memoranda of all telephone conversations relating to attempts to secure Sisneros' return. Defendants may file under seal those parts of any report that they believe may present security concerns.

(4) Defendants shall provide to any and all Arizona officials or other interested non-parties involved in any way in defendants' attempts to secure Sisneros' return to ISP copies of this order so that the conduct of any non-party involved shall be with notice of this court's injunction.

The court specifically does *not* enjoin defendants to place Sisneros in any particular status upon his return, as to do so would plainly infringe upon the discretion of Iowa prison officials. However, defendants are cautioned that any retaliatory action on their part or the part of any Iowa corrections officials towards Sisneros, either for this court's order or any other protected activity Sisneros may engage in, could again result in litigation.

### VIII. CONCLUSION

This case is a reminder that, whatever the public concern with prisoner cases clogging the dockets of the federal courts, "the interpretation of an explicit constitutional protection is [never] to be guided by pure policy preferences for the paring down of prisoner petitions." *Hudson v. McMillian,* 503 U.S. 1, 14, 112 S.Ct. 995, 1003, 117 L.Ed.2d 156 (1992) (Blackmun, J., concurring). The court must assess allegations of prisoners on an individual basis, and having done so in this case, finds that defendants violated Sisneros' rights in one of the ways complained of, but did not in another.

The court has amended and substituted its previous order concerning liability and qualified immunity, but, in substance, its conclusions remain the same. The court concludes that both Sisneros' facial and "as applied" challenges to the English-only rule at the ISP must fail under the "reasonable relationship" test. First, as to the facial challenge, the English-only rule appears to be a valid, cost-effective response to a security concern, and not an exaggerated response. It would be costly for ISP to hire interpreters to read foreign language correspondence and, thus, effectively maintain the security at ISP. While there may be alternative options available to the ISP officials, Sisneros has failed to adduce evidence on this question and therefore failed to carry his burden to establish the existence of ready alternatives. Second, the restrictions imposed on Sisneros by defendants Nix and Hedgepeth are reasonably related to the legitimate penological interest of security, and therefore Sisneros' "as applied" challenge cannot be sustained. Third, even had the court found that the

English-only rule, either on its face or as applied, violated Sisneros' rights, the court concludes that defendants are entitled to qualified immunity as to this claim. At the time defendants Nix and Hedgepeth applied the English-only regulation to Sisneros in 1991, there was no clearly established constitutional principle that the English-only rule in the prison setting was unconstitutional as applied to an inmate similarly situated to Sisneros.

The court concludes, however, that Sisneros' First Amendment rights were violated when he was transferred back to Arizona on February 5, 1992. But for the defendant officials' unconstitutional retaliatory motive, Sisneros would not have been transferred back to Arizona. Specifically, the court concludes that Sisneros was transferred in retaliation for his exercise of the right to utilize the prison grievance procedure and his filing of lawsuits against ISP officials. Because the retaliatory transfer constituted a violation of Sisneros' rights, because the law on retaliatory transfers by prison officials was clearly established at the time of Sisneros' transfer to Arizona, and because there is no basis upon which these defendants could argue that they did not know and should not have known that their actions violated Sisneros' right to be free from retaliatory transfers, defendants are not entitled to qualified immunity from money damages on this claim.

The court therefore has awarded Sisneros compensatory damages in the amount of $5639.20 against defendants jointly and severally. This award is to compensate Sisneros for actual damages in the form of lost wages, mental and emotional distress caused by transfer to more restrictive conditions, loss of out-of-cell time, loss of access to the yard and its exercise facilities, and loss of access to communal activities including meals and sports. Additionally, the court awards Sisneros $1000 in punitive damages against each defendant, because the court concludes that each defendant acted willfully and maliciously in violation of Sisneros' rights in transferring Sisneros back to Arizona. The record demonstrates the willfulness and maliciousness of that conduct, and the failure of defendants to produce a shred of evidence that

their actions were based on legitimate grounds. To summarize, the damages awarded in this case are as follows:

| | |
|---|---|
| Compensatory damages, from defendants jointly and severally, | $5639.20 |
| Punitive damages: | |
| From defendant Hedgepeth | 1000.00 |
| From defendant Nix | 1000.00 |
| TOTAL | $7639.20 |

Finally, the court enjoins defendants to use all available efforts to secure Sisneros' return to Iowa, bear or arrange for payment of all expenses relating to his return, and report to the court every thirty days on all efforts they have undertaken to secure his return. Defendants shall also provide to any and all Arizona officials or other interested non-parties involved in any way in defendants' attempts to secure Sisneros' return to ISP copies of this order so that the conduct of any non-party involved shall be with notice of this court's injunction.

**IT IS SO ORDERED.**